(December 17, 1894.)

## STATE v. PERRY.

[38 Pac. 655.]

ATTORNEY AND CLIENT—PRIVILEGED COMMUNICATIONS—THIRD PERSON OVERHEARING CAN BE COMPELLED TO TESTIFY.—Confidential communications between attorney and client are privileged, and neither client nor his attorney can be compelled to reveal them, but such communications being overheard by a third party, either by accident or design, such third person can be compelled to testify to them.

SAME—ACTS OF CLIENT AND ATTORNEY MAY BE PROVEN.—The acts of both client and his attorney, when relevant to the issue, may be fully proven.

(Syllabus by the court.)

APPEAL from District Court, Bannock County.

H. V. A. Ferguson, for Appellant.

The most notable of early text-writers says, in speaking of the attorneys in the superior courts of Westminister Hall, that they were, "in all points, officers of the respective courts of which they were admitted"; and that they "were peculiarly subject to the censure and animadversion of the judges; and that none were admitted "but such as were virtuous, learned and sworn to do their duty." (Blackstone's Commentaries, bk. 3, c. 3, pp. 25, 26.) It was long ago holden that the "judges will exercise their summary jurisdiction over the at-

torneys of the several courts, not merely in those cases where they have been employed in the conduct of suits, or any matter purely professional; but also 'whenever the employment is so connected with professional character as to afford a presumption that their character formed the ground of their employment.'" (*Hughes v. Marye,* 3 Term Rep. 275; *In re Aitkin,* 4 Barn. & Ald. 47; *Luxmore v. Lethbridge,* 5 Barn. & Ald. 898.) In *Earl of Cholmondeley's Case,* 19 Ves. 261, it was held, that if an attorney should so far forget his professional duty as to voluntarily offer to give in testimony facts communicated by his client, without express consent of his client so to do, "a short way of preventing him would be to strike his name off the roll." (*Earl of Cholmondeley's Case,* 19 Ves. 261; *People v. Barker,* 56 Ill. 287; Cooley's Constitutional Limitations, ed. 1883, 411, 412, and cases cited.) It seems agreed that counselors, attorneys, or solicitors are not obliged to give evidence, or to discover such matters as come to their knowledge in the way of their professions; for, by the duty of their offices, they are obliged to conceal their client's secrets, and everything they are intrusted with is *sub sigillo confessoris.*" (Bacon's Abridgment, Evidence, A 3; *Riggs v. Denniston,* 3 Johns. Cas. 198, 2 Am. Dec. 145; *State v. Dawson,* 90 Mo. 149, 1 S. W. 827; *Marks v. Beyfus,* 25 Q. B. D. 494; *People v. Hamberg,* 84 Cal. 468, 473, 24 Pac. 298; *Sutton v. State,* 16 Tex. App. 490; *State v. James,* 34 S. C. 49, 12 S. E. 657.) "The tendency of modern decisions has been to extend rather than to narrow the rule, from a conviction that, though sometimes the cause of justice might be advanced by compelling disclosures, the evils that would result would greatly overbalance the possible advantages." (Am. Law Reg. 1879, p. 74; *Foster v. Hall,* 12 Pick. 89, 93, 22 Am. Dec. 400; *Cromack v. Heathcote,* 2 Brod. & B. 4; *Regnell v. Sprye,* 10 Beav. 51; *Greenough v. Gaskell,* 1 Mylne & K. 98; *Moore v. Bray,* 10 Pa. St. 519; *Bacon v. Frisbie,* 80 N. Y. 394, 36 Am. Rep. 627, and note; *Preston v. Carr,* 1 Younge & J. 175; *Ross v. Gibbs,* L. R. 8 Eq. 522; *Woods v. Woods,* 4 Hare, 83.)

George M. Parsons, Attorney General, for the State (James H. Hawley, of Counsel).

The particular relations in which it is the policy of the law
to encourage confidence and to preserve it inviolate, are defined
by statute. (Rev. Stats., sec. 5958.) Careless actions which
may betray are not included therein. "When the question is
whether the evidence of a witness is to be excluded on the
ground of privilege, as where the witness is an attorney, and
the evidence is a confidential communication of his client, is
a question for the court." (Thompson on Trials, sec. 326;
*Coveney v. Tannahill,* 1 Hill, 33, 37 Am. Dec. 287, and note.)
That "privilege" extends to attorneys alone, and not to third
parties not interested in a confidential communication. (Whar-
ton's Law of Evidence, 3d ed., secs. 586, 587; *Hoy v. Morris,*
13 Gray, 519, 521, 74 Am. Dec. 650; *Goddard v. Gardner,* 28
Conn. 172; Wharton's Criminal Evidence, 9th ed., sec. 502;
*State v. Mewherter,* 46 Iowa, 94; *Jackson v. French,* 3 Wend.
337, 20 Am. Dec. 699; *Gardner v. People,* 6 Park. C. C. 155;
*People v. Sheriff,* 29 Barb. 622-624; Weeks on Attorneys, sec.
161; *Holman v. Kimball,* 22 Vt. 555; 1 Greenleaf on Evidence,
sec. 254a; *Barnes v. Harris,* 7 Cush. 576, 54 Am. Dec. 734;
*Yordan v. Hess,* 13 Johns. 492.)

In this case the defendant was indicted and charged with the
murder of one Patrick McNamara. The indictment is as
follows: "The said Charles Perry, on the twenty-fifth day of
June, A. D. 1894, at the county of Bannock, state of Idaho, in
and upon one Patrick McNamara, a human being, willfully,
feloniously, and unlawfully did then and there make an assault;
and with a certain hatchet, said hatchet being then and there
a deadly weapon, and which said hatchet he, the said Charles
Perry, then and there in his hands had and held, willfully,
feloniously, and unlawfully, premeditatedly, deliberately, and of
his malice aforethought, and with intent him, the said Patrick
McNamara, then and there to kill and murder, did then and
there strike, beat, and bruise the head of him, the said Patrick
McNamara, then and there and thereby inflicting upon him,
the said Patrick McNamara, one mortal wound, of which mor-
tal wound he, the said Patrick McNamara, then and there in-
stantly died." On July 26, 1894, J. Ed Smith and P. E. Keeler
were appointed to defend said Charles Perry. On the twenty-
seventh day of July the defendant pleaded "not guilty" to the

indictment.  On August 3d the case was called for trial.  The
attorney, J. Ed Smith, did not appear.  Thereupon the court ap-
pointed H. V. A. Ferguson, an attorney, to defend the said
Perry, which the said Ferguson, assisted by P. E. Keeler, did.
On the fourth day of August, the trial coming on, Garrett Sul-
livan, H. E. Evans, Tim McCarty, A. Manassa, Charles Phelps,
George Ross, Lyman Fargo, S. C. Winters, and Dr. I. H. Moore
were sworn as witnesses, and testified in behalf of the state.  G.
Swinehart, George Dash, and L. A. West testified on behalf of
the defendant.  The defendant was convicted of murder in the
first degree, and judgment pronounced.

Defendant moved for new trial, and states the following
reasons: 1. On the ground that the indictment is insufficient
to justify a verdict of murder in the first degree, and insuf-
ficient to justify any conviction greater than manslaughter.  2.
That the verdict and judgment are contrary to the evidence
and the law.  "3. Errors of law, in this: that the court per-
mitted to go to the jury testimony of S. C. Winters as to the
conduct of J. Ed Smith, when said Smith was the attorney of
the defendant, and in particular testifying to the act of said
Smith in showing to the said Winters a ten-dollar bill; evidence
in regard to the ten-dollar bill by Winters and Fargo; and evi-
dence of the analysis of a spot on the bill by Dr. I. H. Moore.
4. In permitting Ross to testify how he, as deputy sheriff,
shadowed and watched the said J. Ed Smith on a certain
night, to a place called Lava, on the Oregon Short Line Rail-
road, and as to what transpired at or near said station, to wit:
That the said George Ross discovered the said J. Ed Smith
stooping down and digging a hole at the foot of a fence post,
and surprised him in the act; and further stating that he, the
said George Ross, went to one side of the said J. Ed Smith to
search at the bottom of another fence post, and that the sheriff
of the county, one Garrett Sullivan, went to the other side of
the said J. Ed Smith, at the foot of another fence post, then
and there dug up a certain handkerchief containing three
twenty dollar gold pieces; and how the said Sullivan exclaimed,
'Boys, I've found the money'; and in further stating that the
said J. Ed Smith sprang forward, and attempted to grab the
money, and said, 'That is my client's money.'  5. The court

erred in permitting Garrett Sullivan, the sheriff of the county of Bannock, a witness for the prosecution, to testify as to how he assisted in shadowing and watching the said J. Ed Smith, the attorney for the above-named defendant, and in following him to Lava station, above mentioned, and in participating in the search for the money, and as to seeing the said J. Ed Smith there."

Charles M. Phelps testified as follows: "My name is Charles M. Phelps. Am acquainted with Perry. Have known him the last three or four weeks. Am confined in the same jail with him. I have had a conversation with him about the murder of McNamara since he has been confined in the jail. This conversation grew out of a talk we had before. The conversation occurred like this: Mr. Caldwell, one morning about 6 or 7 o'clock, was in the habit of letting me out, and this particular morning he told me that the sheriff had discovered Smith at Lava digging up some money." Hereupon the defendant by his counsel moved to strike out the latter portion of the witness' answer, which said motion the court granted. "I told Perry that Caldwell had told me that the sheriff had followed Smith to Lava, and had surprised him in the act of digging up some money. He said: 'I was afraid, when I told Smith about getting that money, that I should not have done it.' This Smith is J. Ed Smith. His relation to the defendant at that time was that he had his case. I know that he had it. Well, there was considerable talk about the matter at that time. I said to him: 'Is that your money Smith found up there?' He said: 'Yes.' I said: 'How did you come to tell Smith you had money up there?' He said: 'He insisted on having his fee, at least enough to cover his expenses, and I had no other means of getting money, and I told him where this was buried.' 'Well,' I said to him, 'you had lots of time to get away from there if you wanted to. You had twenty or thirty hours before the officers got there.' He said: 'Yes; I could have got away, but I got excited over the matter, and didn't think of it.' I had a conversation with him about the other money. I told him a day or two afterward that they had got the bill—the ten-dollar bill he gave Smith—and Smith had got it changed. He admitted that he gave Smith the ten-dollar bill. He said he

didn't think that would cut any figure; that it was a ten-dollar bill he had when he came there, and he said: 'I don't see how it will affect my case at all.' That is when he came to Lava. He said he gave Smith the ten-dollar bill outside the jail since he had been in jail." Cross-examination: "I have been confined in the county jail for some time. I was charged with assault with intent to commit murder. I was not examined before the magistrate. That was in the month of May. I have known Perry since he was brought there and confined in the jail. I have never formed any friendship with the defendant. Q. How long was it before he made a confidant of you and told you things affecting his life and liberty? A. It commenced about the time Smith came to see me about my case. It was Smith, the attorney from Idaho Falls, who came to see me about my case—about the indictment. It was understood that Smith was to represent me if I was tried. I consulted him professionally. I have known Smith a good many years. I have been intimately acquainted with him. We have been friends. If I needed assistance, he would give it to me, and if I could I would give him assistance. I was indicted for murder in old Bingham county. Was tried on an indictment, convicted of the crime of manslaughter, and received a sentence of four years. I served part of that term, and subsequently the term was commuted. It was before my liberation that my friend Smith was arrested for a crime. He was prosecuted by Judge Crawford on a charge of grand larceny involving $400. I was a witness in that case—the Crawford case. I did not see him at that time, and tell him I owed him a great deal, and was ready to do anything I could for him. I was a witness of the facts that occurred. Q. Was it at your suggestion that this man employed Smith? A. I think it was about the first time I wrote Smith. I guess it was after I received a letter from Smith in reply to mine. I didn't speak of Smith until he asked me what attorney I was going to have in my case. I said, Smith. He made some inquiries about him, and I said he was a good, fair lawyer, and was a friend of mine, and I would as soon see him as anyone here. I didn't tell him he would better write Smith. I knew of his writing to Smith. He told me after he wrote the letter. He did not know about

Smith until I told him. He didn't tell me about his case until the 23d or 24th of last month. I am not exact about the date, but it was the next morning after they had found the money at Lava. That was the first time. I did not have an understanding or arrangement or talk with an officer or officers by which it was understood that I was to get what I could out of this man, and receive a lighter punishment myself in consideration. I did not have any talk. No, sir; not a word. When you talk about an understanding, I will tell you. After Perry was put in there, Caldwell said to me: 'I think that man has got this money down there, and has hid it, and I wish you would see if you can find out whether he has or not.' That was all the talk I had. No talk at any other time. I disclosed to Caldwell and lawyer Smith what this man told me. My object in telling them was that I believed that this man was guilty of a cold-blooded murder, and I didn't think any knowledge I had was rightfully withheld. I did not think of benefiting myself. It is a fact that I was indicted for an assault with intent to commit murder. I did not plead to that indictment. I pleaded guilty to an assault with a deadly weapon. I was permitted to do it by the district attorney. I did not talk with him about it before. Have not talked about it at all. Mr. Hawley represents me. I pleaded guilty to that offense. It was not understood that the district attorney would accept the plea. Hawley asked me if I would be willing to plead to it. I said: 'I didn't know I could plead it.' " Redirect examination: "In pleading to a charge of an assault with a deadly weapon, I had no understanding with anyone except my attorney's advice to so plead in case I could get an opportunity. My lawyer told me that it was simply impossible to get a conviction of assault with intent to murder, but that the testimony might warrant a lighter offense or degree. I am an old officer. Was a peace officer for five years: This trial of Smith that counsel refers to was eight or nine years ago, in '84 or '85. I was a witness in the case, and was sworn and examined. I think I was sworn on the part of the defense, though I am not sure. My evidence was such that I am not sure on which side I was called. I did not persuade the defendant to employ Smith. He asked me to intercede with

Smith to take his case, from the fact that he didn't have any money."

George Ross testified as follows: "My official position in this county is that of deputy sheriff. I was at Lava one week ago Monday night. Q. Who was with you? A. Sullivan and myself. We went up there on a freight train, riding on the engine. I saw J. Ed Smith that night. I saw him at Lava. Q. State the circumstances of seeing him there, and what was done. (Question was objected to. Objection overruled, and exception taken.) A. I got off of the engine at the head of the switch, and waited there, probably until midnight, and then started down the track. After I got down the track a ways, I heard a man coughing, and I walked back up, and kept off the railroad track against the wire fence. I saw a man against the fence post, and I walked down to the man, and when I got close to him I said, 'Hello,' and took him by the shoulder, and said, 'What are you doing here'? He had dug a hole probably nine or ten inches deep. I said, what was he doing here? We hunted for the money that was supposed to be buried there, and found it there by another post. Sullivan found it. Smith got the package, and Sullivan took it from him. The package was a white cotton handkerchief. It had been white. It was badly stained, and contained three twenty-dollar gold pieces. From the post where Smith was digging the distance was one post and two little stays between the wire. Smith was digging at a post of a barbed-wire fence, along the railroad. It was sixty or eighty feet straight ahead of the switch, in the direction toward the river, between the section-house and McNamara's house. Can't say how far it was from the section-house. I could recognize the handkerchief again if I were to see it. (Handkerchief shown witness.) Yes, sir; that is the handkerchief that was found there. Sullivan took possession of it at the time. Sullivan opened the handkerchief. I was present at the time. There were three twenty-dollar gold pieces in it at the time. I cannot state the manner in which it was tied in the handkerchief. It was tied close. It took some time to untie it."

Garrett Sullivan testified as follows: "I was present at the time Ross testified about being at Lava. Q. State the trans-

action there as it happened. A. Myself and Ross walked down the railroad track toward the section-house, and saw this man along the fence. The time was about 1 o'clock at night. We saw he was digging by the fence post. We all searched around there, and I happened to find the money one post past him, toward the section-house. When I found the money it was in a handkerchief and tied in two hard knots. Handkerchief has been in my possession ever since—the handkerchief and money. (Handkerchief shown witness.) The handkerchief is in the same condition as when I found it. (Handkerchief offered and received in evidence.) The premises of Mr. McNamara are in Bannock county, Idaho."

Lyman Fargo testified as follows: "My business is that of a merchant. I reside at Pocatello. I know J. Ed Smith of Idaho Falls by sight. I changed a ten-dollar bill for him not long ago. Q. How long ago? A. About a month or six weeks ago. I put the bill in the safe. After that I gave it to you (S. C. Winters, district attorney). I made a note of the number of the bill, taking it from the bill. The number was 9,817,255, series of 1880. I am positive the bill I gave you is the one I got from Smith. I am positive, because it was immediately after I had been to the bank, and I took every bill out of the safe, and he gave me the first one, and when you came in no money had been put in the safe beside that. It was ten or fifteen minutes, or maybe half an hour, after the bill was changed until I gave it to you. I noticed something about the bill; you called my attention to it. I saw a spot. It looked like a blood spot." Cross-examination: "I had the bill only a few minutes when Mr. Winters arrived in the store and told me he wanted it. It was then I took the number of the bill. I did it at his request. I suppose I would not have done it if he had not requested me to."

S. C. Winters testified as follows: "I am acquainted with J. Ed Smith from Idaho Falls. He is a lawyer. I saw him last month in this town. Don't remember the day. Saw him two or three times. I was present when the money was dug up by Sullivan and Ross, and with reference to that day. It was some time after Perry was arrested that I saw Smith. It was on the first trip Smith made here after Perry was arrested. I

know by Smith's appearance in the probate court what rela-
tion Smith had to Perry at this time. He was attorney for
the defendant. As near as I can remember it was 10 or 11
o'clock in the forenoon when I saw Smith on this occasion.
The first time I saw Smith was in the evening. He drove
down the first time, and stayed overnight at my house, and
drove out the next day. When he was going from my office
I knew he was going to the jail. I know he went to the jail—
the jail where defendant was confined. Q. Do you know
what money he had when he started for the jail? (Objected
to. Objection overruled.) A. I don't know, except from
his statement. Q. Did he make you a statement with regard
to having any money? (Objected to by defendant as being
immaterial.) The Court: Hardly think that would come
within the rule. A. I saw Smith when he got back. He
came to my office when he got back from the jail. I don't
know the exact time he had been at the jail; it might have
been an hour. Q. Did you see him with any money when he
got back? (Objected to. Objection overruled.) A. I did.
The kind of money was a ten-dollar bill. He produced that
money from his pockets. I don't know from which pocket.
The condition of the bill was this: it was folded about one
inch square; folded very tight. I saw the bill afterward. I
examined it at the time, and told him I could not make the
change. I didn't notice the number. I noticed the kind of
bill. It was a greenback, and I recognized the bill afterward
from the folds in it. I had it in my possession at the time
only for a second. From my place Smith went to Fargo's. I
sent him to the store to change the bill. After he went to
Fargo's I went to the door of the hall, and watched till he got
to Fargo's. Then I went to Fargo's, and asked him for the
bill, and it was given me by Fargo. I recognized the bill
given me by Fargo as the same bill Smith had shown me in
my office. I am positive of that. I took the number of the
bill. The number is 9,817,255, greenback series of 1880. I
then gave it to Dr. Moore. I observed on the bill a spot or
mark on the corner as if a thumb had been placed there. I
observed that, and turned it over to Dr. Moore. Dr. Moore
has had it ever since."

Dr. Moore testified as follows: "I am a physician and sur-
geon. Have had some experience in analytical chemistry. I
know Mr. Winters. He gave me a bill to examine and analyze.
It was a greenback. This is it. There was a little stain on it
at the time I got it. These. two round places here indicate
where the stain was. I can tell what the substance of the
stain was. It was blood. I made a microscopic analysis of it,
and found the blood of a mammal by the coloring matter in the
blood. (Bill offered and received in evidence.)" Cross-ex-
amination: "The whole length that science goes is to tell that
it was blood. I can't tell whether it was from a human being
or a pig or some other warm-blooded animal."

MORGAN, J. (After Stating the Facts.)—The first error
relied upon in defendant's brief is, the court erred in over-
ruling defendant's motion for a new trial on account of the
insufficiency of the indictment to support a conviction of mur-
der in the first degree. I insert the charging part of the in-
dictment, so that it may be seen what it does charge. It will
be noticed that the indictment charges that the beating with
the hatchet, which is alleged to be a deadly weapon, was done
willfully, feloniously, and unlawfully, premeditatedly, deliber-
ately, and with his malice aforethought, and with intent him,
the said Patrick McNamara, to kill and murder, did then and
there strike, beat, etc., inflicting a mortal wound, of which he,
the said McNamara, then and there immediately died. This
indictment charges deliberation, premeditation, with the inten-
tion, and all the necessary words to make a complete indict-
ment as laid down in our statute (Rev. Stats., sec. 7677), and
as explained and construed in *Territory v. Evans,* 2 Idaho,
425, 17 Pac. 139, and supplies the very words wanting in the
indictment in the case of *People v. O'Callaghan,* 2 Idaho, 156,
9 Pac. 414. The indictment seems to be entirely sufficient,
and charges murder in the first degree.

The third error assigned is really the one on which the de-
fendant relies for a reversal of this case. This as given in his
brief is as follows: The court erred in overruling the defend-
ant's motion for a new trial on account of improper and illegal
and inadmissible evidence being received on the trial, to wit,

of Garrett Sullivan, George Ross, S. C. Winters, Lyman Fargo, and I. H. Moore, all of whose testimony was received over the objection of the defendant's counsel. I have inserted this testimony in full, so that we may see just what these witnesses testified to. I also inserted the defendant's attorney's statement of this testimony, which is in his third specification of error, and is in the record, and as much a part of it as the testimony of the witnesses, because it differs so materially from the evidence as given in the bill of exceptions, showing that even the testimony of these witnesses is not given in full but only an abstract thereof. Upon stating these alleged errors, the attorney for the defendant proceeds to give a history of the life of J. Ed Smith, of a crime he was alleged to have committed, his practice, his alleged shortcomings, etc., and then proceeds to give the biography of Charles Phelps, a witness who was a prisoner with the defendant Perry at the time of, and immediately before, the trial of the defendant. This is a very ingenious method of leading the court off the main case, and on to the trial of another, and entirely different case from the one before the court. We must insist on sticking to the trial of Charles Perry, and decline to try J. Ed Smith until he is regularly before the court, when he might wish to bring in some evidence in his own defense, which he cannot now do. The defendant's attorney objected to the testimony of the witnesses before named because it was evidence of the acts and doings of J. Ed Smith, the attorney and confidential adviser of the defendant when the acts were performed. Not a word that Smith uttered during the whole time that he was defendant's attorney was permitted to be proven, except an unimportant sentence, which he uttered when the sheriff, Sullivan, found the money, which was, "That is my client's money." It is unquestionably the law that confidential communications made to the attorney Smith by his client, Perry, should not be disclosed by Smith, nor can the court compel him to disclose whatever may have been told him while he was the attorney of Perry; but it is very different with regard to the acts of Smith, even if they tend to convict Perry of the crime with which he is charged. It appears from the record that Ross, deputy sheriff, and Sullivan, sheriff, shadowed Smith after he

was employed as the attorney of the defendant; that is, they watched him and followed him to Lava, on the Oregon Short Line Railroad. It also appears that the house of McNamara, the murdered man, wherein he was murdered, was but a short distance from Lava station. They went there at night, and, going up the track a short distance, the sheriff and his deputy surprised Smith digging about the fence post; that after they came upon him they went to digging, and the sheriff discovered a handkerchief with sixty dollars in gold in it. What evidence the court and jury had as to the ownership of this money we do not know, as but a small part of the evidence is before this court. For aught the court knows, it might have been proven that the deceased had three twenty-dollar gold pieces just before the killing; the presumption of law is that the court had evidence before it sufficient to show, or tending to show, that it belonged to the murdered man. After the finding of the money, Perry, the defendant, tells Phelps, his fellow-prisoner, that he had told Smith where this money was; that Smith had demanded his fee, and he had nothing else to pay him with. There is not one word of testimony in the record showing that Smith had told the sheriff or the district attorney that he was going after this money, nor is there any evidence whatever tending to show that he had given them any information that he knew where there was money, or that he had intimated that they would better watch him. There is no evidence in this transaction of finding this money which even tends to show that up to this time Smith had in any way betrayed his trust. The presumption of law is that he was faithful to his client, and this must be overcome with proof. It is clear that if the defendant had been discovered in digging up this money it could have been proven. The acts of Smith in digging for this money are no more sacred than are the acts of the defendant. The communication of the defendant to his attorney, the attorney cannot be forced to reveal; but the acts of both the defendant and his attorney, which are relevant to the case, can be proven to the fullest extent. So of statements made to his attorney by his client. Statements made to an attorney by a client, concerning a case about which he is consulting his attorney, the court cannot compel the attorney to disclose; but if

such statements are overheard by a third party, accidentally or otherwise, the latter may be made a witness, and compelled to disclose the statements. (See *Hoy v. Morris,* 13 Gray, 519, 74 Am. Dec. 650.) This was a breach of promise case. Todd was the attorney for the defendant. Defendant told Todd, his counsel, that he had some real estate in Mendon which he wanted to convey to Ferguson, and that he was afraid that a girl would sue him for breach of promise. This conversation was overheard by Aldrich, who was in an adjoining room. It was proposed to prove it by Aldrich, and was objected to as being a confidential communication between attorney and client. The court says Aldrich was not an attorney nor in any way connected with Todd. He was a mere bystander, and casually overheard the conversation not addressed to him, nor intended for his ear, but which the client and his attorney meant to have respected as private and confidential. Mr. Todd could not lawfully have revealed it, but, in consequence of a want of precaution, the communication between him and his client was overheard by a mere stranger. As the latter stood in no relation of confidence to either of the parties, he was clearly not within the rule of exemption from giving testimony, and he might therefore be summoned as a witness, be compelled to testify to what he overheard, so far as it was pertinent to the subject matter on inquiry upon the trial. In *Hatton v. Robinson,* 14 Pick. 416, 25 Am. Dec. 415, it was held that communications made to an attorney at law, by a party who applied to him to make a conveyance of his personal property for the purpose of preventing it from being attached by a portion of his creditors, were competent and admissible evidence. So if when the defendant told his attorney, Smith, about this money that was buried at or near the murdered man's house, the conversation had been overheard by one of the prisoners, or any other person, he could be compelled to testify to it. In *Shields v. State,* 104 Ala. 35, 53 Am. St. Rep. 17, 16 South. 87, defendant was prosecuted for carrying concealed weapons, and convicted. It appears that the defendant had called at the jail to see a cousin there confined. The sheriff, before permitting him to go in, searched him against his consent, and found the pistol for carrying which he was prosecuted. The court say

the search was unlawful, yet the evidence obtained by the unlawful search belonged to the state, and the sheriff could be compelled to testify to the finding of the pistol, and proceeds as follows: "The defendant made no admission or confession. He was simply the unresisting victim of unlawful violence, and, if he had made an admission or confession, its exclusion would have been unavoidable, because not free and voluntary." In *State v. Flynn*, 36 N. H. 64, the court says: "It seems to us an unfounded idea that the discovery made by the officers and their assistants in the execution of process, whether legal or illegal, or where they intrude upon a man's privacy without any legal warrant, the information thus obtained is not the admission of the party, nor evidence given by him, in any sense. The party has in his power certain mute witnesses, as they may be called, which he endeavors to keep out of sight, so they may not disclose the facts which he desires to conceal. By force or fraud access is gained to them, and they are examined to see what evidence they bear. That evidence belongs to the state. If the party should have the power to keep out of sight or out of reach of persons who can give evidence of facts he desires to suppress, and he attempts to do that, and is defeated by force or cunning, the testimony given by such witnesses is not his testimony nor evidence which he has been compelled to furnish against himself. It is their own. It does not seem to us possible to establish a sound distinction between that case and the case of the counterfeit bills, the forger's implements, the false keys or the like, which have been obtained by similar means."

In the case at bar there could be no conspiracy to betray the prisoner, unless there were two persons in this conspiracy, as one cannot conspire alone. We must not only have evidence that Smith betrayed his client, of which, in my opinion, we have none, as all the circumstances connected with obtaining this evidence may be explained. It may have occurred through the carelessness or even ignorance of the attorney, and not through any desire or intention to betray his client; want of care on the part of Smith may have led him into any or all of the mistakes that gave away this evidence; but, in order to have a conspiracy, we must believe that the prosecuting attorney was also in the conspiracy to obtain the evidence in this way, of which we again

have no evidence. We cannot reverse a case on an inference or an impression. We must have positive evidence of error, as all intendments are in favor of the proceedings of the court below, and it must be presumed that everything was done to give the defendant a fair and impartial trial, unless the contrary affirmatively appears in the record itself. There is no evidence, as I have said, that the state had anything to do with the acts of Smith by means of which this evidence was obtained, and the evidence is entirely proper, in the absence of a conspiracy between the state and the defendant's attorney. In the case of *Shields v. State, supra,* where the searching of the defendant was illegal, the court further says: "The law appoints the remedy for the redress of the wrong, but the exclusion of the evidence is not within the scope of the remedy or the measure of redress. Evidence is not infrequently obtained by methods which are reprehensible in good morals, offensive to fair dealing, subjecting it to unfavorable inferences; the party relying upon it must neutralize to entitle it to full credence, and evidence is sometimes obtained under circumstances which meet with the unqualified disapprobation of the courts. The evidence, however unfairly and illegally obtained, is not subject to exclusion, if it·be of facts in themselves relevant, except when a party accused of crime has been compelled to do some positive affirmative act inculpating himself, or an admission or confession has been extorted from him by force, or drawn from him by appliances to his hopes or fears." (1 Greenleaf on Evidence, 254a; *Commonwealth v. Dana,* 2 Met. (Mass.) 329-337; *State v. Flynn,* 36 N. H. 64; *Gindrat v. People,* 138 Ill. 103, 27 N. E. 1085; *Cotton v. State,* 87 Ala. 75, 6 South, 396.) The case of *Commonwealth v. Dana, supra,* was the seizure of lottery tickets illegally kept for sale. The seizure was made under a search-warrant asserted to be illegal and void. The court sustained the validity of the warrant but, in answer to the objections proceeding on the invalidity of the warrant and the consequent illegality of the search, said: "Admitting that the lottery tickets and materials were illegally seized, still this is no legal objection to the admission of them as evidence. If the search-warrant were illegal, or if the officer serving the warrant exceeded his authority, the party on whose complaint

the warrant issued, or the officer, would be responsible for the wrong done. But this is no good reason for excluding the papers seized as evidence, if they were pertinent to the issue, as they unquestionably were. When papers are offered in evidence, the court can take no notice how they were obtained— whether lawfully or unlawfully—nor would they form a collateral issue to determine that question. This point was decided in the cases of *Legatt v. Tollervey,* 14 East, 302, and *Jordan v. Lewis,* 14 East, 306, note; and we are entirely satisfied that the principle on which these cases were decided is sound and well established. We adhere to the proposition to be extracted from the authorities to which we have referred—that, however unfair or illegal may be the methods by which evidence may be obtained in a criminal case, if relevant, it is admissible, if the accused is not compelled to do any act which criminated himself, or a confession or admission is not extorted from him, or drawn from him by appliances to his hopes and fears. The objections to the admissibility of the evidence were properly overruled." (*Shields v. State, supra.*) In the case of *People v. Barker,* 60 Mich. 277, 1 Am. St. Rep. 501, and note, 27 N. W. 539, when Pinkerton, a detective was introduced to the defendant Barker as a distinguished attorney, by the name of Trude, from Chicago, and the defendant was advised to employ him, said Pinkerton, alias Trude, as his attorney, it was done. Pinkerton as such attorney then advised confession of certain matters. The Barkers, defendants, were brothers. Pinkerton advised Marshall Barker what story he should tell, which was that he, Marshall killed the deceased in self-defense, and that he got William to help him carry off the body. This the pretended attorney told him would get William off with a light sentence and clear him entirely. Having gained the confidence of the defendants in this way, he secured the confession. The court held that Pinkerton, having personated an attorney, could not be permitted to testify to the confessions so obtained. After the confessions so made, the Barkers conferred with one another, being confined in different parts of the jail, by writing letters back and forth, in which certain facts were stated that were pertinent evidence. These letters were secured by the sheriff, and sought to be introduced as evidence. Although

the writing of these letters resulted from their interviews with Pinkerton, they were admitted as evidence, and this was approved by the supreme court. From all these cases it very clearly appears that while the communications between counsel and client cannot be revealed by the counsel, nor, as stated, can the counsel be compelled to testify to them on the trial, if these statements are overheard by a third party, either by eavesdropping or by accident, the third person so hearing them can be compelled to testify to them. All the acts of the attorney may be proven as fully as though they were the acts of the defendant himself. It follows, then, that the acts of Smith were all proper evidence, at least in the absence of proof that there was a conspiracy between the district attorney and the attorney, Smith, to procure confessions by deceit in capacity of attorney and then give them away to the prosecution. It is also a well-settled principle of law that, where testimony is *prima facie* competent and relevant, the burden of showing by competent evidence that it should not be admitted is upon the defendant. This the defendant in this case, as appears by the record, made no effort whatever to do. No questions of any kind were asked of the witnesses, Sullivan and Ross, as to what reason they had for shadowing J. Ed. Smith, or as to whether he had given them any intimation whatever, either by word or deed, that he had information which might be of advantage to the prosecution. The same is true as to S. C. Winters. He was not questioned by the defendant's attorney upon this point. It is apparent that this might have been fully proven by these witnesses if they had been interrogated on the subject and if it had been a fact.

What kind of evidence must we have in order to convict Smith of having deliberately betrayed his client? There is no positive evidence that he betrayed him. In my view of the case, there is not circumstantial evidence sufficient to work such conviction, so far as this record goes. What other evidence of his perfidy there may be outside of the record I do not know, and I do not propose to inquire. If the circumstances connected with the acts of Smith are such that they can be explained upon any other reasonable hypothesis than the one that Smith was guilty of conspiring to betray his client, it is the

duty of the court to so explain them. Smith was and is one of the officers of the court. It is the presumption of law, and therefore the presumption of this court, that Smith, so far as he went in this case, performed his duties as well as he knew how, and faithfully. This presumption must be overcome by evidence. A careful reading of the testimony in this case will, I think, fail to show it. As is stated, nothing derogatory to Smith can be presumed from the fact that he went to see the district attorney when he went to Pocatello, or that he stayed overnight with him while there. All the rest of the circumstances may have happened through the inadvertence of Smith, or carelessness or ignorance, if you pleace. His acts in getting the bill changed were proper evidence, the same as they would be if they had been the acts of Perry. Say that he was careless, ignorant, and that the public prosecutor saw this, and took advantage of it, still the evidence was proper. The same may be said of his acts in going down to dig up the money. Admit the further fact that the district attorney was present with the sheriff and deputy on this occasion, still the evidence is perfectly proper. It is entirely proper if the district attorney thought it necessary that he should be present with the sheriff when they were watching Smith, and does not militate against the evidence in the least. As I have already said, we must believe that the prosecutor was a party to this conspiracy to betray the defendant also, in order to convict Smith, of which there is no evidence. Indeed, I think we may be justified in holding that the guilt of Smith, in the betrayal of his cient, must appear from the evidence in this record beyond a reasonable doubt, in order to reverse the case on that ground. The evidence that Smith obtained this bill from the prisoner is also furnished by the confession of Perry to the witness Phelps, which was entirely voluntary, and no objection is made to this evidence. So with the testimony of Phelps that Perry told him that he had told Smith where the money was buried. Again, there is only a small part of the record in this case here; only a part of the testimony of five witnesses, and there were ten testified. The presumption is that everything was done in the court below to give the defendant a fair and impartial trial. The presumption is also that there was sufficient, pertinent, and competent

evidence to support the verdict of the jury and to work a conviction. (*People v. Williams,* 45 Cal. 25; *Territory v. Evans,* 2 Idaho, 425, 17 Pac. 139.)  Where the testimony of the court below is not in the record, it is well settled that in such case this court is bound to presume that the testimony was in every respect sufficient to support the verdict.  All presumptions are in favor of the court below. (*Miles v. Thorne,* 38 Cal. 337, 99 Am. Dec. 384, and note.)  All presumptions are in favor of the correctness of the proceedings of courts of general jurisdiction. (*Parker v. Altschul,* 60 Cal. 381; *White v. Abernathy,* 3 Cal. 426; *Toulouse v. Burkett,* 2 Idaho, 288, 13 Pac. 172; *Lowe v. Turner,* 1 Idaho, 107.)  All intendments must be in favor of sustaining the judgment of courts of original jurisdiction, and, to disturb such judgment, it is not enough that error may have intervened, but it must be affirmatively shown by the record. (*Goodman v. Milling Co.,* 1 Idaho, 131.)  Can we overcome all these presumptions of law by supposing or inferring from the circumstances that Smith betrayed his client willfully, premeditatedly, and upon such evidence as we have in this case?  I must dissent strenuously from such conclusion.  I must say, as to the guilt of Smith and the complicity of the district attorney, "Not proven."

Since the hearing in this case the attorney for the defendant has sent this court a private letter, accompanied by two affidavits.  Copies of these affidavits have not been served upon the attorney for the state.  He is entirely ignorant of their existence.  The court cannot even read affidavits presented in this way.  They were evidently intended to affect the judgment of this court.  It would be manifestly improper for the court to permit such attempts to influence its judgment.  I acquit the attorney who managed this case of any thought of doing anything improper, and attribute the circumstance above stated to excessive zeal in behalf of his client.  The record in this case shows that the defendant was not without able assistance in this cause; indeed, it shows that the attorney appointed to conduct the defense did his duty with marked ability and much persistence.  The judgment of the lower court is affirmed, and the district court is directed to take the necessary steps to put the judgment in execution.

SULLIVAN, J., Concurring.—I concur in the conclusion reached by Justice Morgan. I do not think the record shows that the defendant's attorney designedly disclosed any knowledge that he had obtained through privileged communications from his client, thus putting into the hands of the prosecution material evidence against the defendant. If the record showed that he did so, I am not clear that the judgment should be reversed for that reason. For it is apparent that, if the defendant could prevent material evidence from being introduced against him by his attorney making to the prosecution a "designed betrayal" thereof, such betrayals might be made and used to defeat a conviction. An unscrupulous attorney might thus serve his client more effectively by betraying material evidence, and then deserting him, than by being faithful to him. Subdivision 2, section 5958 of the Revised Statutes provides that "an attorney cannot, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment." Said provision does not prohibit, in terms, the introduction of material evidence that has been revealed by the carelessness, or even design, of the attorney, which he acquired through privileged communications from his client. It simply declares that an attorney cannot, without the consent of his client, be examined as a witness as to any privileged communications. If an attorney discloses evidence so obtained damaging to his client, it, no doubt, would and ought to ruin his business and blast his reputation; but I am not clear that material evidence thus obtained should be excluded because of such disclosure and betrayal. I am not aware of an instance of the willful betrayal of a client by his attorney appearing in the books.

HUSTON, C. J., Dissenting.—I am unable to agree with the majority of the court, and for the following reasons: The defendant is charged with the crime of murder in the killing of one Patrick McNamara, at Lava, Bannock county, Idaho, on the twenty-fifth day of June, 1894. He was indicted, tried and convicted at the July term, 1894, of the district court of Bannock county. A motion for a new trial was made and overruled. Appeal is taken from both the judgment and the order overruling the motion for a new trial. The case is before us

upon a bill of exceptions, which presents only so much of the evidence as is by counsel deemed essential to the proper presentation of the exceptions taken. Some of the exceptions which appear in the record were virtually abandoned upon the argument, and I shall therefore only consider such as were urged and insisted upon at the hearing in this court. The second error presented by appellant in his brief, and the only one upon which he seems to rely, is as follows: "The court erred in overruling the defendant's motion for a new trial on account of improper and illegal and inadmissible evidence having been received on the trial, to wit, the evidence of Garrett Sullivan, George Ross, S. C. Winters, Lyman Fargo and I. H. Moore, all of whose testimony was received over the objections and exceptions of the defendant's counsel." The record before us, and it is to that we are confined, shows the following facts:

The defendant was arrested shortly after the date (25th of June) of the alleged homicide. He was incarcerated in the jail of Pocatello, Bannock county, and subsequently, but upon what date does not appear by the record, was examined before the probate court of said Bannock county upon the charge of murder aforesaid. Upon said examination one J. Ed Smith, an attorney regularly admitted to practice as such in the fifth judicial district of Idaho, appeared as counsel for said defendant. After the examination the defendant was by said court committed to the jail of Bannock county without bail to await the action of the grand jury of said Bannock county. The district court for Bannock county convened on July 23, 1894, and on that day the said J. Ed Smith appeared as counsel for defendant, and exercised on the part of defendant his right of challenge to the grand jury. On the twenty-sixth day of July said grand jury presented a true bill of indictment against the defendant, charging him with the crime of murder in the killing of Patrick McNamara aforesaid. Upon his arraignment on said indictment, "it appearing to the court that the said Charles Perry is unable to employ counsel, J. Ed Smith, Esq., and P. E. Keeler, Esq., were appointed by the court to defend him." On the 27th of July, the defendant, with his counsel, came into court, and entered his plea of not guilty to said indictment. On July 30th, "by consent of counsel," the cause

was set for hearing on the third day of August, 1894. On August 3d, the following entry appears in the records: "J. Ed Smith, counsel heretofore appointed by the court to defend the above defendant, failing to appear in court, the court appointed H. V. A. Ferguson, Esq., to appear on behalf of said defendant."

The following is the evidence, admitted over the objection of defendant, and which appears in the bill of exceptions in the record:

C. M. Phelps was a witness, who was duly sworn, and testified upon oath as follows, to wit: "My name is Charles M. Phelps. Am acquainted with Perry. Have known him the last three or four weeks. Am confined in the same jail with him. I have had a conversation with him, about the murder of McNamara, since he has been confined in the jail. This conversation grew out of a talk we had before. The conversation occurred like this: Mr. Caldwell, one morning about 6 or 7 o'clock, was in the habit of letting me out, and this particular morning he told me that the sheriff had discovered Smith at Lava digging up some money. I told Perry that Caldwell had told me that the sheriff had followed Smith to Lava, and had surprised him in the act of digging up some money. He said: 'I was afraid, when I told Smith about getting that money, that I should not have done it.' This Smith is J. Ed Smith. His relation to the defendant at that time was that he had his case. I know that he had it. Well, there was considerable talk about the matter at that time. I said to him: 'Is this your money Smith found up there?' He said: 'Yes.' I said: 'How did you come to tell Smith you had money up there?' He said: 'He insisted on having his fee, at least enough to cover his expenses, and I had no other means of getting money, and I told him where this was buried.' 'Well,' I said to him, 'you had lots of time to get away from there if you wanted to. You had twenty or thirty hours before the officers got there.' He said: 'Yes; I could have got away, but I got excited over the matter, and didn't think of it.' I had a conversation with him about the other money. I told him a day or two afterward that they had got the bill—the ten-dollar bill he gave Smith—and Smith had got it changed. He

admitted that he gave Smith the ten-dollar bill. He said he
didn't think that that would cut any figure; that it was a ten-
dollar bill he had when he came here, and he said: 'I don't see
how that will affect my case at all.' That is when he came
to Lava. He said he gave Smith the ten-dollar bill outside the
jail since he had been in jail." Cross-examination: "I have
been confined in the county jail for some time. I was charged
with an assault with intent to commit murder. I was not ex-
amined before the magistrate. That was in the month of May.
I have known Perry since he was brought there and confined in
the jail. I have never formed any friendship with the defend-
ant. Q. How long was it before he made a confidant of you,
and told you things affecting his life and liberty? A. It
commenced about the time Smith came to see me about my
case. It was Smith, the attorney from Idaho Falls, who came
to see me about my case—about the indictment. It was under-
stood that Smith was to represent me if I was tried. I con-
sulted him professionally. I have known Smith a good many
years. I have been intimately acquainted with him. We have
been friends. If I needed assistance he would give it to me,
and if I could I would give him assistance. I was indicted for
murder in the old Bingham county. Was tried on an indict-
ment, convicted of the crime of manslaughter, and received a
sentence of four years. I served part of that term, and sub-
sequently that sentence was commuted. It was before my lib-
eration that my friend Smith was arrested for crime. He was
prosecuted by Judge Crawford on a charge of grand larceny,
involving $400. I was a witness in that case—the Crawford
case. I did not see him at that time and tell him that I owed
him a great deal, and was ready to do anything I could for
him. I was a witness of the facts that occurred. Q. Was it
at your suggestion that this man employed Smith? A. I
think it was about the first time I wrote Smith. I guess it
was after I received a letter from Smith in reply to mine. I
didn't speak of Smith until he asked me what attorney I was
going to have in my case. I said, Smith. He made some in-
quiries about him, and I said he was a good, fair lawyer, and
was a friend of mine, and I would as soon see him as any one
here. I didn't tell him he would better write Smith. I knew

of his writing to Smith. He told me after he wrote the letter. He did not know about Smith until I told him. He didn't tell me about his case until the 23d or 24th of last month. I am not exact about the date, but it was the next morning after they had found the money at Lava. That was the first time. I did not have an understanding or arrangement or talk with an officer or officers by which it was understood that I was to get what I could out of this man and receive a lighter punishment myself in consideration. I did not have any talk. No, sir; not a word. When you talk about an understanding, I will tell you. After Perry was put in there, Caldwell said to me: 'I think this man has got this money down there, and has hid it, and I wish you would see if you can find out whether he has or not.' That was all the talk I had. No talk at any other time. I disclosed to Caldwell and lawyer Smith what this man told me. My object in telling them was that I believed that this man was guilty of a cold-blooded murder, and I didn't think any knowledge I had was rightfully withheld. I did not think of benefiting myself. It is a fact that I was indicted for an assault with intent to commit murder. I did not plead to that indictment. I pleaded guilty to an assault with a deadly weapon. I was permitted to do it by the district attorney. I did not talk with him about it before. Have not talked about it at all. Mr. Hawley represents me. I pleaded guilty to that offense. It was not understood that the district attorney would accept that plea. Hawley asked me if I would be willing to plead to it. I said, 'I didn't know I could plead to it.' " Redirect examination: "In pleading to a charge of an assault with a deadly weapon I had no understanding with any one except my attorney's advice to so plead in case I could get an opportunity. My lawyer told me that it was simply impossible to get a conviction of assault with intent to murder, but that the testimony might warrant a lighter offense or degree. I am an old officer. Was a peace officer for five years. This trial of Smith that counsel refers to was eight or nine years ago, in '84 or '85. I was a witness in the case, and was sworn and examined. I think I was sworn on the part of the defense, though I am not sure. My evidence was such that I am not sure on which side I was called. I did not persuade the de-

fendant to employ Smith. He asked me to intercede with Smith to take his case, from the fact that he didn't have any money."

And thereupon, to further support the indictment, the state of Idaho called George Ross, who was duly sworn as a witness, and testified as follows, to wit: "My official position in this county is that of deputy sheriff. I was at Lava one week ago Monday night. Q. Who were with you? A. Sullivan and myself. We went up there on a freight train, riding on the engine. I saw J. Ed Smith that night. I saw him at Lava. Q. State the circumstances of seeing him there, and what was done. A. I got off the engine at the head of the switch and waited there probably until midnight, and then started down the track. After I got down the track a ways I heard a man coughing, and I walked back up, and kept off the railroad track against the wire fence. I saw a man against the fence post, and I walked down to the man, and when I got close to him I said, 'Hello,' and took him by the shoulder, and said, 'What are you doing here?' He had dug a hole probably nine or ten inches deep. I said, what was he doing here. We hunted for the money that was supposed to be buried there, and found it there by another post. Sullivan found it. Smith got the package, and Sullivan took it from him. The package was a white cotton handkerchief. It had been white. It was badly stained, and contained three twenty-dollar gold pieces. From the post where Smith was digging the distance was one post and two little stays between the wire. Smith was digging at a post of a barbed-wire fence, along the railroad. It was sixty or eighty feet straight ahead of the switch in the direction toward the river, between the section-house and McNamara's house. Can't say how far it was from the section-house. I could recognize the handkerchief again if I were to see it. (Handkerchief shown witness.) Yes, sir; that is the handkerchief that was found there. Sullivan took possession of it at the time. Sullivan opened the handkerchief. I was present at the time. There were three twenty-dollar gold pieces in it at the time. I cannot state the manner in which it was tied in the handkerchief. It was tied close. It took some time to untie it."

Thereupon to further support the indictment, the state of Idaho recalled Garrett Sullivan as a witness, who, having been already duly sworn, testified as follows, to wit: "I was present at the time Ross testified about being at Lava. Q. State the transaction there as it happened. A. Myself and Ross walked down the railroad track toward the section-house, and saw this man along the fence. The time was about 1 o'clock at night. We saw he was digging by the fence post. We all searched around there, and I happened to find the money one post past him, toward the section-house. When I found the money it was in a handkerchief, and tied in two hard knots. Handkerchief has been in my possession ever since—the handkerchief and money. (Handkerchief shown witness.) The handkerchief is in the same condition as when I found it. (Handkerchief offered and received in evidence.) The premises of Mr. McNamara are in Bannock county, Idaho."

And thereupon, to further support the indictment, the state of Idaho called Lyman Fargo as a witness, who, being duly sworn, testified as follows, to wit: "My business is that of a merchant. I reside at Pocatello. I know J. Ed Smith of Idaho Falls by sight. I changed a ten-dollar bill for him not long ago. Q. How long ago? A. About a month or six weeks ago. I put the bill in the safe. After that I gave it to you (Hon. S. C. Winters, district attorney). I made a note of the number of the bill, taking it from the bill. The number was 9,817,255, series of 1880. I am positive the bill I gave you is the one I got from Smith. I am positive, because it was immediately after I had been to the bank, and I took every bill out of the safe, and he gave me the first one, and when you came in no money had been put in the safe beside that. It was ten or fifteen minutes, or maybe half an hour, after the bill was changed until I gave it to you. I noticed something about the bill. You called my attention to it. I saw the spot. It looked like a blood spot." Cross-examination: "I had the bill only a few minutes when Mr. Winters arrived in the store and told me he wanted it. It was then I took the number of the bill. I did it at his request. I suppose I would not have done it if he had not requested me to."

And thereupon, to further support the indictment, the state of Idaho called S. C. Winters, Esq., as a witness, who, being duly sworn, testified as follows, to wit: "I am acquainted with J. Ed Smith, from Idaho Falls. He is a lawyer. I saw him last month in this town. Don't remember the day. Saw him two or three times. I was present when the money was dug up by Sullivan and Ross, and with reference to that day. It was some time after Perry was arrested that I saw Smith. It was on the first trip Smith made here after Perry was arrested. I know by Smith's appearance in the probate court what relation Smith had to Perry at this time. He was attorney for the defendant. As near as I can remember, it was 10 or 11 o'clock in the forenoon when I saw Smith on this occasion. The first time I saw Smith was in the evening. He drove down the first time, and stayed overnight at my house, and drove out the next day. When he was going from my office I knew he was going to the jail. I know he went to the jail; the jail where the defendant was confined. Q. Do you know what money he had when he started for the jail? A. I don't know, except from his statement. Q. Did he make you a statement with regard to having any money? (Objected to by the defendant as being immaterial.) The Court: I hardly think that would come within the rule. A. I saw Smith after he got back. He came to my office when he got back from the jail. I don't know the exact time he had been at the jail. It might have been an hour. Q. Did you see him with any money when he got back? A. I did. The kind of money was a ten-dollar bill. He produced that money from his pockets. I don't know from which pocket. The condition of the bill was this: it was folded about one inch square, folded very tight. I saw the bill afterward. I examined it at the time, and told him I could not make the change. I didn't notice the number. I noticed the kind of bill. It was a greenback, and I recognized the bill afterward from the folds in it. I had it in my possession at the time only for a second. From my place Smith went to Fargo's. I sent him to the store to change the bill. After he went to Fargo's I went to the door of the hall and watched till he got to Fargo's. Then I went to Fargo's, and asked him for the bill, and it was

given me by Fargo. I recognized the bill given me by Fargo as the same bill Smith had shown me in my office. I am positive of that. I took the number of the bill. The number is A 9,817,255, greenback series of 1880. I then gave it to Dr. Moore. I observed on the bill a spot—a mark on the corner —as if a thumb had been placed there. I observed that, and turned it over to Dr. Moore to analyze it. Dr. Moore has had the bill ever since."

Dr. Moore was called by the state as a witness, who, being duly sworn, testified as follows: "I am a physician and surgeon. Have had some experience in analytical chemistry. I know Mr. Winters. He gave me a bill to examine and analyze. It was a greenback. This is it. There was a little stain on it at the time I got it. These two round places here indicate where the stain was. I can tell what the substance of the stain was. It was blood. I made a microscopic analysis, and found blood corpuscles. I made a chemical analysis of it, and found the blood of a mammal by the coloring matter in the blood. (Bill offered and received in evidence.)" Cross-examination: "The whole length that science goes is to tell that it was blood. I can't tell whether it was from a human being or a pig, or some other warm-blooded animal."

It is the theory of appellant that J. Ed Smith, after having been retained by defendant to defend him upon the said indictment, wickedly and purposely betrayed his client to the prosecution by giving up to the prosecuting officer the evidence he had received from his client, which evidence, appellant claims, was material, and without which his conviction would have been, at least, problematical, and which evidence was obtained by said J. Ed Smith solely through and by reason of his relation of counsel to defendant. This theory of appellant involves the most serious charge ever made against an attorney in the history of civilized jurisprudence; it involves a conclusion before which the court may well stand appalled. The question presented is entirely novel. I have been unable to find, by the most diligent search and investigation, either a parallel or a precedent for it. It is to the credit of the legal profession that it is so. Questions similar to that raised by this record have been frequently before the courts, and the

decisions have been quite uniform. The most, in fact, all of
the cases which I have examined, have turned upon the admis-
sibility of evidence fraudulently or illegally procured, and the
distinction has been generally between what has been directly
derived through the medium of confessions, illegally or fraud-
ulently procured, and that which has been arrived at as the
result of the evidence thus procured. In *Gindrat v. People,*
138 Ill. 103, 27 N. E. 1085, the evidence objected to was pro-
cured by an unlawful entry upon the premises of defendant.
The supreme court of Illinois say in that case: "Courts, in the
administration of the criminal law, are not accustomed to be
over-sensitive in regard to the sources from which the evidence
comes, and will avail themselves of all evidence that is com-
petent and pertinent, and not subversive of some constitutional
or legal right." The case of *Shields v. State,* 104 Ala. 35, 53
Am. St. Rep. 17, 16 South. 85 (an Alabama case), is upon
like facts with *Gindrat v. People.* The evidence objected to
was procured through an admitted unlawful search of the per-
son of defendant. The court held in the last case that, while
the officer might have been guilty of a misdemeanor in pro-
curing the evidence, still the court would not for that reason
exclude it, and it has been repeatedly held that the manner of
obtaining the evidence is directed to its credibility, not to its
admissibility. The case of *People v. Barker,* 60 Mich. 277, 1
Am. St. Rep. 501, and note, 27 N. W. 539, perhaps approaches
nearer the case at bar, upon the facts, than any other case we
have been able to reach. In that case, while the defendants
were confined in jail under a charge of murder, the prosecut-
ing attorney, under an arrangement with Pinkerton's De-
tective Agency, at Chicago, procured the arrest, and incarcera-
tion in the jail where defendants were confined, of a person
named Stearns upon a fictitious charge. Shortly after his con-
finement Stearns was visited by one Mat. Pinkerton, a member
of the notorious Pinkerton gang of Chicago, who was intro-
duced as A. S. Trude, an eminent lawyer of Chicago, and who
appeared as counsel for the man Stearns. The bogus Trude
was by Stearns introduced to the Barkers as an attorney of
high standing and reputation, and was upon the recommenda-
tion of Stearns employed by the Barkers to defend them upon

the charge which they were held to answer. Under the guise of their counsel, Pinkerton, *alias* Trude, procured from the Barkers certain confessions in regard to the murder. The Barkers were separately confined in the jail. As a result of their consultations with their fraudulently pretended attorney, certain letters were written by the Barkers to each other and to their wives. These letters were surreptitiously conveyed to the hands of the prosecuting officer. Upon the trial of the Barkers, the man Pinkerton, with the effrontery peculiar to men of his profession, went upon the witness-stand to testify to the communications procured by him from the Barkers under his fraudulent guise of attorney. The trial court refused to admit any statements made by the Barkers to Pinkerton while he was assuming to be the attorney of defendants, but did permit the admission of the letters procured as aforesaid. This comes nearer, upon the facts, to the case at bar than any I have been able to find, and yet there is an almost immeasurable gulf between the position of an employed detective, who is not presumed to be actuated or inspired by any other motive or consideration than the successful completion of his job—who is not influenced or controlled by any moral or legal obligations—and that of an attorney who, as a sworn officer of the court, has been intrusted, by reason of the integrity which his membership of an honorable profession is supposed to imply, with the defense of a man charged with a crime involving his life. The action of the detective, while it may be considered despicable, cannot be called criminal, while the same act by an attorney is one of those crimes—

> "Whose eminent fame hell joys at,
>   And the celestial angels that look on it
>   Wish their keen, airy vision dim and narrow."

The law furnishes no name for such a crime, for it has been heretofore unknown in the annals of jurisprudence. That the one who had been appointed to guard the rights of the defendant upon his trial should be the first to "set the bloodhounds of the law upon his track" is an act of such superlative infamy that even "stern justice will blush to be so cheered upon her guilty prey." While it is true we are compelled to reach a

conclusion upon the evidence of circumstances, still, when we apply the same rule to the acts of this man Smith that we apply to other cases resting upon circumstantial evidence, it is possible, it seems to me, to arrive at but one conclusion. The counsel for the state in his argument tells us he has no excuse or explanation to offer of or for the conduct of Smith; that he "considers it simply infamous." Now, either Smith's conduct was entirely innocent, or it was entirely infamous. He either did betray the defendant, or he did not. There is no stopping place—no half-way station—between these two conclusions. If the acts of Smith were infamous, they were so because, in violation of his official oath, in violation of every principle of honor, integrity and humanity, he wickedly betrayed to death the man he had been appointed to defend. If he did this, and I cannot come to any other conclusion, from the evidence, how can it be said that the defendant, arraigned upon a capital charge, had that fair and impartial trial, guaranteed to every man charged with crime beneath the *aegis* of civilized law, and the denial of which is but an indirect indorsement of "lynch law"? With the question of the guilt or innocence of the defendant we have nothing to do in the consideration of this appeal. The sole question presented to us upon this record is, Was there such error in the admission of the testimony set out in the record, and duly excepted to on the trial, as prevented the defendant from having a fair and impartial trial? I think there was. It clearly appears to me that this case comes under the exception in *Gindrat v. People, supra,* as one "subversive of some constitutional or legal right." It is the highest duty of the courts to see that the law is administered in justice. If Smith would not be allowed to go upon the stand and testify to communications made to him by the defendant while he was acting as his attorney, could he accomplish the same result by indirection? If he could, the rule which assumes to throw a shield around the client is a delusion and a snare. In the case of *Moore v. Bray,* 10 Pa. St. 519, it was held that "communications of the object for which an assignment of a mortgage was made to counsel, concerned for the assignee on the distribution of the proceeds of the mortgaged premises, are privileged, although

no question then arose as to the object of the assignment, and the counsel considered the communication in the light of a casual conversation"; and the court in that case says, of this class of communications: "They fall directly then within the circle of privileged communications, of which reasons of public policy forbid the disclosure, not because of a privilege enjoyed by the counsel, but for the safety of the client. It is of infinite consequence to suitors that the trust reposed in professional men should not be violated." If this rule is of such importance in civil cases, where mere dollars and cents are at stake, of how much more importance, does it become where the life of the client is involved! In the consideration of a case resting upon circumstantial evidence, while it is important to examine with scrutinizing care the strength of each link in the chain, we should not fall into the error of confining ourselves to the absolute or individual strength of each separate link, but should consider their relative strength. Now, there is no intendment to be predicated upon the fact that J. Ed Smith, the attorney for the defendant, when in Pocatello cohabited with the prosecuting attorney, nor are we to assume anything derogatory to the said Smith from the fact that he called upon the district attorney just prior to visiting the defendant in jail, and informed the district attorney that he (Smith) had no money; but when these facts are taken in connection with the other facts in the case; when we see this man returning within one hour to the office of the district attorney, and passing over to him the evidence procured by him (Smith) from his client, which was to aid materially in sending that client to the scaffold—even judicial credulity, it seems to me, must waver. It is true, as has been suggested, J. Ed Smith is not on trial, but the acts of J. Ed Smith are in this case, as presented to us by the record, of most serious consequence; as it is upon those acts, the motive which prompted them and their evident effect upon the conclusion of the jury, that this case rests. The conduct of Smith at the time he was discovered digging for the buried money; the fact of the prosecuting attorney and the sheriff and deputy being on hand at just the right time, when the residence of Smith is some fifty miles from that of said officers—all these facts, taken in

cónnection with the shameful abandonment of his client, as soon as he had secured immunity for his dear old friend, the twice convicted criminal Phelps, all taken together, form an array of circumstances which it seems to me should carry conviction to any mind.

Multitudinous as the authorities may be in support of the doctrine that, in the administration of the criminal law, courts will not be over-technical in inquiring into the method by which evidence may have been procured, we have found none which have failed to draw the line at the point where, in the language of the supreme court of Illinois in *Gindrat v. People, supra,* the methods resorted to in the procuration of the evidence have "been subversive of some constitutional or legal right." A defendant comes before the court charged with the most serious crime known to our laws. He is poor and friendless. The law says that notwithstanding the accusation, notwithstanding the apparently conclusive character of the circumstances surrounding the perpetration of the crime with which he is charged, he shall be deemed innocent of that crime until he has been duly and legally proven guilty thereof. Aye, more; the beneficence of an enlightened and christianized jurisprudence provides further, that the unfortunate being thus situated shall not, by reason of his misfortunes, be left defenseless; but in the recognition of the elemental principle of our government, that "all men are equal before the law," it will give to the defendant so situated all the benefits which another more fortunate in worldly pelf could secure, and will appoint from among the sworn officers of the court one to defend and protect the defendant in the fearfully perilous position in which he finds himself. And where the one so appointed, so sworn to "be true to his client," betrays that client to the scaffold, can it be said that there has been nothing here "subversive of the constitutional or legal rights of the defendant"? Can it be truthfully said that the defendant, under these circumstances, has had that fair and impartial trial guaranteed to him by the constitution and the laws? The fact must not be overlooked that there was no positive testimony against Perry. His conviction rests entirely upon circumstantial evidence. Courts are technically considered to be mere

abstractions, and yet, as experience shows, they are, after all, mere men, subject to the same "skyey influences" which afflict other human habitations; and it is important therefore, that, in the consideration of purely legal propositions, they do not permit themselves to be overinfluenced by the horrors made manifest by the facts in the case. This court in the consideration of this case is peculiarly circumstanced. We have heretofore, as evidenced by repeated decisions, strenuously opposed the practice, all too prevalent, we think, in this country, of so construing the rule that all presumptions of fact are in favor of the innocence of the accused—as to give judicial recognition to any and all objections which the ingenuity of counsel may suggest in behalf of his client charged with crime—and from this position of the court I have no desire or disposition to swerve. I am as little inclined, however, to take from the party accused of crime even the shadow of a constitutional or legal right. The majesty of the law is only to be maintained by a most strict and careful adherence to the principles of fairness and impartiality in its administration. The crime of which the defendant has been convicted is the most heinous, and deserving of the punishment awarded to those guilty of its commission, when duly and legally convicted. A most careful and laborious examination of the record in this, forces me to the conclusion that those charged with the administration of the law in this case have been governed more by the reprehensible rule that "the end justified the means" than by any earnest desire to aid in the administration of the law in justice. When I consider the relations of the attorney, Smith, with the criminal, Phelps; the means adopted by Phelps to secure Smith's employment by the defendant; the palpable object of both Smith and Phelps, especially when the former learned that the defendant was unable to pay his fee; the peculiar relations of Smith to the prosecuting attorney; his passing over to the latter, almost immediately upon its reception by him, of the evidence he had received from his client, and which was to form so strong a link in the chain of evidence by which his conviction was to be secured; when I consider the unexplained, and to my mind unexplainable, coincidence of the almost simultaneous appearance of Smith, the district attorney and the sheriff and

his deputy, at the place where the money was buried (for there is no evidence in the record upon which any "shadowing" of Smith by anyone can be predicated) ; when I consider the conduct of Smith at that place; his coughing, evidently to direct the attention of the officer to his presence; his immediately joining the officers in the search for the money; his shameful and wicked abandonment of his client when all the end he aimed at, the securing of a light punishment for his comrade, Phelps, had been accomplished—all these things, taken together, leave an abiding conviction in my mind that the defendant was betrayed to his death by the acts of this man Smith, who had, as a sworn officer of the court, been appointed to defend him. If I am right in this conclusion, then, foul as the crime of which the defendant has been convicted is, much fouler and far more baneful in its consequences are the means by which that conviction has been accomplished. When the defendant shall have paid the penalty of his crime, the record, so far as he is concerned, is closed, but who can calculate the consequence that may ensue from a judicial recognition of the methods adopted in this case? I am compelled to dissent from the conclusion of the majority of the court. I think a new trial should be awarded defendant.