657 P.2d 17
STATE of Idaho, Plaintiff-Respondent,

v.

Monte Craig HOISINGTON,
Defendant-Appellant.

No. 13104.

Supreme Court of Idaho.

Jan. 7, 1983.

Darrel W. Aherin, of Aherin & Rice, Lewiston, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., Gordon Petrie, Sp. Deputy Atty. Gen., Howard Carsman, Deputy Atty. Gen., Boise, for plaintiff-respondent.

BAKES, Justice.

## I.

## FACTS

Appellant appeals his convictions for two counts of rape and one count of an infamous crime against nature. One count of rape and the count of an infamous crime against nature were perpetrated against the same victim and occurred as part of one attack. The appellant was tried on both counts in one trial. The second count of rape arose from an attack on a different victim at a different time and place. Judgments on all three convictions, however, were entered at the same time before the same judge and are all the subject of this one appeal. Since the facts surrounding the three convictions are related, we present the facts in combined fashion, but discuss the merits of each case separately.

On June 5, 1977, Linda O'Connor was accosted and raped at approximately 2:30 a.m. in her apartment in Lewiston, Idaho. At the time of the attack, she awoke to find a pillow over her face. She did not see her attacker, but felt a wavy type curly hair that was about collar length. The investigating police officer, Sgt. Saleen, inspected the downstairs bathroom, which contained a sliding window to the outside. Saleen found dust or dirt on the right portion of the toilet seat. He also observed a dirt or scuff mark on top of the small telephone box below the bathroom window. In addition, candle holders which Linda O'Connor had placed on the windowsill were located outside on the patio. Saleen also found two latent fingerprints on the outside of the bathroom window sill.

On July 4, 1977, Tracy Boyd was accosted in her apartment in Lewiston, Idaho, at approximately 6:00 a.m. Boyd testified that there was enough natural light to allow her to see clearly. She testified that the assailant, whom she identified as appellant, had a knife and just stood and stared at her for a few seconds. During this time Boyd said that she saw the appellant's face. Thereafter, he walked around Boyd's bed and stopped just a few inches from it. Boyd then screamed twice and the assailant grabbed her shoulder and ordered her to roll over onto her stomach. He then put a pillow over the back of her head and ordered her to get up without looking at him. The assailant then placed the knifepoint near Boyd's throat and pushed her out of her room and into her roommate's room. Following their entry into the room, the assailant ordered both Boyd and her roommate to place pillows over their heads. The roommate testified, however, that prior to that time she clearly saw the assailant's full face for a few seconds, and that such observation was made with the intent of remembering his appearance. Thereafter, she saw the assailant's face once again when she looked out from under the pillow. It was during this time in the roommate's room that the rape and unnatural act were committed on Boyd. The assailant then left, telling the women to stay in the room for five minutes. Boyd and her roommate assisted the police in making a composite drawing of the assailant; however, no arrest was made in either the Boyd or the O'Connor incidents.

On December 6, 1977, appellant Monte Hoisington was contacted at his place of employment by Lewiston police officer Spears, who said he was investigating a prowling incident. At the suggestion of Spears, Hoisington accompanied the officer to the police station. Within a few minutes of arriving at the police station, Hoisington was recognized as bearing a resemblance to the rape suspect being sought. He was given his *Miranda* rights, but was not arrested. Detective Spears asked whether appellant understood those rights, and he

indicated that he did and agreed to talk to Spears. Appellant was told by Spears that appellant fit the description of the suspect of a series of rapes. Spears also informed him that he fit the description of a composite that had been done of the rapist, with the exception of his hair length. (Hoisington's hair was cut short at the time of the questioning; however, the composite had been run in a local newspaper on November 15, 1977.)

After questioning, Spears requested permission to take Hoisington's photograph. Spears explained that the photo would be shown to victims of the rapes in question. Thereafter, the photograph was taken. Appellant was also administered a polygraph examination, the results of which were inconclusive. Then, Spears told appellant that latent fingerprints had been taken from one of the rape scenes, and that the police department wished to compare his prints with the latents. Appellant was then fingerprinted. The state and appellant disagree on whether there was consent to the fingerprinting. Appellant asserts that he was not asked about nor did he consent to the fingerprinting. Rather, he argues that he merely acquiesced to asserted authority of the police to take the fingerprints.

On the 8th and 9th of December, 1977, Sharon Fuller, who was Boyd's roommate, and Boyd were separately shown a six-photo lineup containing Hoisington's picture. Both selected Hoisington's picture as resembling the rapist. On the 9th of December, at 6:00 p.m., Detective Spears was notified by the FBI that the latent prints taken from Linda O'Connor's windowsill matched Hoisington's military service prints. On December 10, 1977, the police arrested Hoisington for the alleged rape of Linda O'Connor. Incident to the arrest, Hoisington was refingerprinted. On December 11, 1977, police presented two 8 × 10 photos of Hoisington obtained from the Lewiston Tribune files to Sharon Fuller, who identified the person in the pictures as Tracy Boyd's attacker. The photos showed Hoisington next to a large elk which he had shot. One photo had appeared in the newspaper earlier in the fall, and both showed Hoisington with almost shoulder length wavy hair. On December 12, 1977, police presented the same 8 × 10 photos to Tracy Boyd, again obtaining a positive identification. On December 14, 1977, Hoisington was charged with the rape and crime against nature in the Boyd case. Also, on December 14, 1977, both Fuller and Boyd identified the appellant in a corporeal lineup. Linda O'Connor failed, however, to identify Hoisington's voice in a voice lineup.

On March 22, 1978, a hearing was held before the district court concerning a motion to suppress both the in-court identification of Hoisington by Boyd and Fuller, and to suppress Hoisington's prints obtained on December 6 and 10. In regard to the identification question, the court found that Boyd's and Fuller's identifications of Hoisington were based on their own recollection and were not the result of suggestive identification procedures. In particular, the court noted that a composite drawing was made shortly after the attack on Boyd, and that "there is a striking resemblance to the defendant in that picture." In addition, the court concluded in reference to the six-picture lineup that "there is not real great difference in the general appearance of each of the pictures." As to the fingerprints, the court found that the December 6 fingerprints were taken by consent of Hoisington, and impliedly concluded that the December 10 fingerprints were taken pursuant to Hoisington's arrest. The motion to suppress was therefore denied.

At trial in the Boyd case, the court refused to permit expert testimony as to the reliability of eye witness identification in general. Also, in the trial of the Boyd case, the court permitted a court reporter to testify to an incriminating comment which she heard the defendant make to his counsel during the preliminary hearing. Appellant was convicted in the Boyd case of both rape and an infamous crime against nature. After a separate trial, appellant was also convicted of the rape of Linda O'Connor. All three convictions are the subject of this appeal.

## II.

## O'CONNOR CASE

■ The primary issue which appellant raises in the O'Connor case is with regard to the admission of the fingerprint evidence at trial. The fingerprint evidence admitted at trial consisted of the latent prints obtained at the O'Connor residence, the December 10, 1977 prints taken upon appellant's arrest, and photographic negatives and enlargements of the same. In particular, Hoisington argues that the court erred in admitting the December 10 fingerprints, because they were obtained as a result of the December 6, 1977 fingerprinting which appellant asserts was unlawful, and which therefore constituted "fruit of the poisonous tree." Since we conclude that the December 6 fingerprinting itself was not unlawful, we do not address the "fruit of the poisonous tree" argument.

The state argues, and the trial court found, that the December 6, 1977 fingerprinting of Hoisington was done pursuant to Hoisington's consent. Consent is one of the specifically established exceptions to the search warrant requirement under the Fourth and Fourteenth Amendments. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). In *Schneckloth* it was held that while the state bears the burden of proving that consent was, in fact, freely and voluntarily given, 412 U.S. at 222, 93 S.Ct. at 2045, the question of "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." 412 U.S. at 227, 93 S.Ct. at 2047. *See United States v. Mendenhall,* 446 U.S. 544, 557–58, 100 S.Ct. 1870, 1878–79, 64 L.Ed.2d 497 (1980). We recently recognized and applied the totality of the circumstances test in *State v. Christofferson,* 101 Idaho 156, 610 P.2d 515 (1980), and are called upon to do so again in the present case.

There is no dispute between the state and Hoisington that Hoisington consented to accompany officer Spears to the police station. Rather, the controversy centers on whether Hoisington, after having voluntarily gone to the police station, thereafter consented to the taking of his fingerprints. It is undisputed that Hoisington, after arriving at the police station, was given a *Miranda* warning, was informed that he fit the description of the suspect in a series of rapes, and consented both to being photographed and to the administration of a polygraph examination which proved inconclusive. Following the administration of the polygraph examination, Hoisington fingerprints were taken by officer Spears. There is some dispute as to what occurred with regard to the fingerprinting. Hoisington testified at a pre-trial hearing that just before he went to the place of the polygraph examination, officer Saleen told officer Spears, who was accompanying Hoisington, that Spears should take Hoisington's fingerprints. Then, Saleen also told Hoisington words to the effect that while Hoisington had to be asked whether he would take a polygraph examination, or would allow his photograph to be taken, he did not have to be asked whether the police could take his fingerprints, and that he had to give them. Hoisington's reply, in his own words, was "fine, whatever." Hoisington then testified that after the polygraph examination, officer Spears said, "I think we're going to take your fingerprints now." Hoisington's answer was, "all right."

In rebuttal, officer Saleen contradicted much of Hoisington's statement. Saleen stated that while he had asked Spears to obtain some fingerprints, he had not made any statements to Hoisington to the effect that he had to give the fingerprints. Officer Spears, on rebuttal, also testified that Hoisington's statement was inaccurate. Spears added that after the polygraph examination, he asked Hoisington if he could take a set of fingerprints. Spears showed Hoisington the fingerprint card and explained why the prints were wanted. Hoisington then said, "okay." The appellant, in light of the foregoing, does not argue that there was no consent given, rather, he ar-

gues that any consent that was given was no more than "acquiescence to perceived police authority." Appellant relies in particular upon *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), which held that "[w]here there is coercion there cannot be consent." 391 U.S. at 550, 88 S.Ct. at 1792. Application of *Bumper* to this case, however, is subject to the "totality of circumstances" test set forth in the subsequent case of *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), as discussed above.[1] With reference to *Bumper,* the following was stated in *Schneckloth:*

> "[I]f under *all the circumstances* it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or granted *only* in submission to a claim of lawful authority— then we have found the consent invalid and the search unreasonable. *See, e.g., Bumper v. North Carolina,* 391 U.S. at 548–549 [88 S.Ct. at 1791–92]." 412 U.S. at 233, 93 S.Ct. at 2050. (Emphasis added.)

Under the "totality of the circumstances" standard, it was for the trial court to determine, as questions of fact, whether the alleged statement was made, and whether the statement was *the* motivating factor in the granting of consent by Hoisington. Hoisington had voluntarily come to the police station, had voluntarily allowed photographing, and had voluntarily submitted to a polygraph examination, all of which were intrusions of equivalent or greater severity than fingerprinting, *see United States v. Dionisio,* 410 U.S. 1, 14–15, 93 S.Ct. 764, 771–72, 35 L.Ed.2d 67 (1973). In our view, the evidence is sufficient to support the finding by the trial court that Hoisington's consent was voluntary, and that the state

has met its burden of proof. Consequently, since we cannot say that the trial court's finding of voluntary consent was clearly erroneous, we will not disturb it on appeal. *E.g., United States v. Wasserteil,* 641 F.2d 704, 707 (9th Cir.1981); *United States v. Sanchez-Jaramillo,* 637 F.2d 1094, 1098 (7th Cir.1980), *cert. denied,* 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 79 (1980); *United States v. Berd,* 634 F.2d 979, 986 (5th Cir. 1981); *United States v. Williams,* 604 F.2d 1102, 1125–26 (8th Cir.1979); *United States v. Miller,* 589 F.2d 1117, 1130 (1st Cir.1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *United States v. Amos,* 566 F.2d 899, 901 (4th Cir.1979).

Hoisington also argues that the taking of his fingerprints is prohibited under *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). In *Davis,* police rounded up at least 24 black youths and took them to police headquarters where they were questioned briefly, fingerprinted and released without charge. Fingerprints obtained from the defendant in the roundup led to his conviction for rape. The Supreme Court reversed the conviction in *Davis,* holding that detentions for the sole purpose of obtaining fingerprints are no less subject to the constraints of the fourth amendment, than are arrests or investigative detentions. 391 U.S. at 727, 89 S.Ct. at 1397.[2]

In the present case, however, the appellant was not "detained," but rather was voluntarily present at the police station, and voluntarily consented to the fingerprinting. The Court in *Davis* pointed out that the case did not involve a situation where the defendant had voluntarily consented to accompany officers to the police station and willingly submitted to fingerprinting. 394 U.S. at 726, 89 S.Ct. at 1397. Subsequently, in *United States v. Dionisio,*

---

1. We held in *State v. Christofferson,* 101 Idaho 156, 610 P.2d 515 (1980), that *Bumper* was not applicable where officers did not state that they had a warrant, and did not condition their use of a warrant on a refusal of the defendant to consent, despite the fact that the defendants believed the police would wait until a warrant arrived.

2. The court in *Davis,* however, intimated that due to the unintrusive nature of fingerprinting

itself, narrowly circumscribed procedures including judicial approval of brief detention for obtaining, during the course of a criminal investigation, the fingerprints of individuals for whom there was no probable cause to arrest might be permissible. The reasoning of the Supreme Court in *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), would also seem to support that conclusion. *See* I.C. § 19–625.

410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), the United States Supreme Court pointed out that "in *Davis* it was the initial seizure—the lawless dragnet detention—that violated the Fourth and Fourteenth Amendments, not the taking of the fingerprints," 410 U.S. at 11, 93 S.Ct. at 770, because there can be no reasonable expectation of privacy in physical characteristics, such as fingerprints, which are exposed to the public. *Cf. State v. Curry,* 103 Idaho 332, 647 P.2d 788 (Idaho App.1982) (no expectation of privacy in shoes being worn). Consequently, since Hoisington's presence at the police station was voluntary, and he in no way limited or conditioned his voluntary appearance, or protested the fingerprinting, and was not forcefully or coercively intimidated from doing so, it cannot be said that Hoisington's fingerprinting was the result of an illegal detention, and therefore violative of the Fourth Amendment and *Davis v. Mississippi, supra. See State v. Dillon,* 93 Idaho 698, 705 n. 7, 471 P.2d 553, 560 n. 7 (1970).

■ Although not assigned as error, or briefed, appellant at oral argument also asserted that the trial court erred in denying admission of evidence concerning a voice identification proceeding in which Linda O'Connor misidentified the voice of a police officer as the voice of her assailant. The trial court denied admission of the evidence on the basis that there was nothing in the record "that could lead the jury to believe that the complaining witness ever thought she could identify the voice." Since neither party has raised or argued this issue in their briefs, we do not review the issue. I.A.R. 35 requires that issues and arguments thereon be presented in the parties' briefs. "This Court has consistently followed the rule that it will not review the actions of a district court which have not been specifically assigned as error[,] [e]specially where there are no authorities cited nor argument contained in the briefs upon the question." *Bolen v. Baker,* 69 Idaho 93, 99, 203 P.2d 376, 379 (1949) (citations omitted); *e.g., State v. Dennard,* 102 Idaho 824, 825 n. 2, 642 P.2d 61, 62 n. 2 (1982). The appellant's conviction in the O'Connor case is affirmed.

## III.

### BOYD CASE

#### A. Court reporter's testimony.

■ With regard to the Boyd case, Hoisington first argues that allowing the court reporter to testify concerning an incriminating statement which she heard the appellant make to his counsel at the preliminary hearing violated appellant's right to counsel under the sixth and fourteenth amendments. At the preliminary hearing, Tracy Boyd testified concerning a pillow that was placed over her head by the assailant. At trial, as a witness in the state's rebuttal, the court reporter was subpoenaed and testified that during the above described testimony at the preliminary hearing, she heard the appellant say to his attorney words to the effect that "he had not placed the pillow that way, or that was not how the pillow was placed." Generally, if the client chooses to make or receive a communication to or from his attorney in the presence and hearing of a third person the communication is not confidential, and the third party may be compelled to disclose the statements which he heard. *State v. Perry,* 4 Idaho 224, 236–7, 38 P. 655, 659 (1894); 81 Am.Jur.2d, Witnesses § 187 (1976). Thus, in *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), the Supreme Court held that a defendant's right to counsel had not been violated due to the presence of an undercover agent during an attorney/client meeting. At one point, the court noted the differences between interception of attorney/client communication by electronic surveillance as opposed to interception by undercover agents. The court stated the following:

"One threat to the effective assistance of counsel posed by government interception of attorney-client communications lies in the inhibition of free exchanges between defendant and counsel because of the fear of being overheard. However, a fear that some third party may turn out to be a government agent will inhibit attorney-client communication to a lesser degree than the fear that the government is monitoring those communications

through electronic eavesdropping, *because the former intrusion may be avoided by excluding third parties from defense meetings or refraining from divulging defense strategy when third parties are present at those meetings.*" 429 U.S. at 554–5 n. 4, 97 S.Ct. at 843 n. 4 (emphasis added).

On the one hand, the above quotation shows that the interception of an attorney/client communication by a court reporter has some similarity to interception by means of electronic surveillance. While a defendant can exclude third parties, such as an undercover agent, from defense meetings, he cannot exclude the court reporter from a judicial proceeding. From that standpoint, this case is distinguishable from *People v. Castiel,* 153 Cal.App.2d 653, 315 P.2d 79 (1957), where a court reporter was permitted to testify concerning a conversation between counsel and defendant which occurred *during recess.* In that situation, the defendant and his counsel were not compelled to be in the presence of the court reporter. On the other hand, the great danger flowing from electronic surveillance is that client and counsel are unaware of the access of others to their conversation. However, "[i]n the courtroom both client and attorney are conscious of the presence of third persons and necessarily must know from the location of such persons as to whether or not their conversations may be overheard." *United States v. Denno,* 221 F.2d 626, 629 (2d Cir.), *cert. denied* 349 U.S. 968, 75 S.Ct. 906, 99 L.Ed. 1289 (1955). Thus, while it may be inconvenient for client and counsel to have to converse in whispers, the existence of such a burden by itself does not trespass upon the fair and reliable determination of guilt or innocence, or infringe any federal constitutional right. *United States v. Denno, supra; United States v. Fay,* 230 F.Supp. 942, 947 (S.D.N. Y.1964); *State v. Grant,* 135 Vt. 222, 373 A.2d 847 (1977); *cf. Dobbins v. State,* 483 P.2d 255, 260 (Wyo.1971) (conversation heard by court spectator not privileged). In the courtroom the attorney and client are quite aware of the adversarial circumstances in which they find themselves, and the

presence of security officers and court personnel.

There appear to be two lines of cases that have particular relevance to the issue presented. One line concerns the ability of a defendant to communicate freely with counsel in the presence of a guard. The general view is that a defendant's right to counsel precludes a guard from testifying concerning conversations that he has overheard between defendant and his attorney. *E.g., People v. Harris,* 84 A.D.2d 63, 445 N.Y.S.2d 520, 547–48 (1981). Another line of cases dictates that although it may be an inconvenience, a defendant is not denied his right to counsel if circumstances require that he communicate in whispers. *United States v. Denno, supra; United States v. Fay, supra; State v. Grant, supra.* In *Fay* and *Grant,* the courts found no violation of defendant's right to counsel where the defendant and counsel were seated in close proximity to the jury. In *Denno* no violation was found even though a police officer was seated for security reasons in the first spectator's row, only a few feet behind the defendant. Thus, even though defendant and counsel were required to sit in close proximity to others, they were nevertheless obligated to keep their communications discreet by whispering. Such a requirement is certainly a reasonable one considering the nature of judicial proceedings where the court reporter, jury and even spectators must be seated so as to be able to hear the course of the proceedings.

Assuming without deciding that allowing the court reporter to testify would have violated either the appellant's constitutionally protected right to counsel, or would otherwise have been inadmissible, we nevertheless conclude that admission of that testimony was harmless error in this case. *State v. Perry,* 4 Idaho 224, 38 P. 655 (1894); 81 Am.Jur.2d Witnesses, § 187 (1976). As this Court recently stated in *State v. LePage,* 102 Idaho 387, 630 P.2d 674 (1981), "This Court has held, however, in applying the 'harmless error' rule that where the admissible evidence provides, beyond a rea-

sonable doubt, 'overwhelming and conclusive' proof of a defendant's guilt, the admission of tainted evidence will be held to be harmless error." 102 Idaho at 395, 630 P.2d at 682. In the present case there is an abundance of other evidence upon which a conviction could be based. The victim and her roommate gave police a description of the rapist immediately following the crime. The appellant fit that description (with the exception of his hair length). Both witnesses picked appellant's picture out of a photo lineup. Both positively identified the rapist from another picture of appellant. Both victims identified appellant in a corporeal lineup.[3] Both witnesses positively identified the defendant at trial as the attacker.

We hold that because there is, beyond a reasonable doubt, overwhelming and conclusive proof of this defendant's guilt, the admission of the court reporter's testimony, if erroneous, was harmless. *State v. LePage, supra.*

B. Identification.

■ The next issue raised by appellant is whether the trial court erred in admitting identification testimony by Tracy Boyd and Sharon Fuller. Appellant's primary argument in this respect is that the photographic lineups and single subject photo showups presented to Boyd and Fuller were so suggestive as to deny him due process of law under the fourteenth amendment. Secondarily in appellant's argument, it is also suggested that he may have been denied his right to counsel in that the photo lineups and showups were not conducted in the presence of defense counsel. Both of these arguments were recently the subject of review by this Court in *State v. Crawford,* 99 Idaho 87, 102–04, 577 P.2d 1135, 1150–52 (1978). With regard to the question of whether a defendant has the right to have counsel present during a photographic lineup or showup, we held in *Crawford,* following the United States Supreme Court ruling in *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), that the

answer is clearly no. 99 Idaho at 102, 577 P.2d at 1151. The reasoning behind that rule is as follows:

"A photographic showing, unlike a corporeal identification, is not a 'trial-like adversary confrontation' between an accused and agents of the government; hence, 'no possibility arises that the accused might be misled by his lack of familiarity with the law or overpowered by his professional adversary.' Moreover, even without attending the prosecution's photographic showing, defense counsel has an equal chance to prepare for trial by presenting his own photographic displays to witnesses before trial .... '[D]uplication by defense counsel is a safeguard that normally is not available when a formal confrontation occurs.' " *Moore v. Illinois,* 434 U.S. 220, 227 n. 3, 98 S.Ct. 458, 464 n. 3, 54 L.Ed.2d 424 (1977) (citations to *United States v. Ash, supra,* omitted); *see United States v. Ash,* 413 U.S. at 317–19, 93 S.Ct. at 2577–78.

Thus, Hoisington was not entitled to have counsel present at the photographic lineups and showups.

■ Appellant's due process argument is more substantial. In *Crawford,* we recognized that under *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), and *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), "[t]he due process test for suppression of an in-court identification that is allegedly tainted by an impermissibly suggestive out-of-court identification is whether the out-of-court identification was so suggestive that there is a very substantial likelihood of misidentification." 99 Idaho at 103, 577 P.2d at 1151. Under the standards established in those cases, there will not be a "very substantial likelihood of misidentification" as long as "the identification possesses sufficient aspects of reliability." *Id.* As stated in *Manson,* "[R]eliability is the linchpin in determining the admissibility of identification testimony." 432 U.S. at 114, 97 S.Ct. at

**3.** We hold today, in Part III(B), *infra,* that the identifications made in this case were not taint-

ed, as urged by appellant.

2253. That rule applies to both in-court identification as well as evidence concerning out-of-court identifications. 432 U.S. at 106 n. 9, 97 S.Ct. at 2249 n. 9. Thus, as stated in *Neil v. Biggers,* 409 U.S. at 199, 93 S.Ct. at 382, the central question is "whether under 'the totality of the circumstances' the identification was reliable even though the [identification] procedure was suggestive."

■ Factors to be considered under the totality of circumstances test in determining whether an identification is reliable include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the identification, and (5) the length of time between the crime and the identification. *Manson v. Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253; *Neil v. Biggers,* 409 U.S. at 199, 93 S.Ct. at 382.[4] If there are "aspects of reliability" evident from an evaluation of those factors which are sufficient to outweigh "the corrupting effect of the suggestive identification," then the admission of identification testimony or evidence will not violate due process. *Manson v. Brathwaite,* 432 U.S. at 106, 114, 97 S.Ct. at 2249, 2253.

■ In the present case some of the identification procedures employed by the police may have been in some respects suggestive. In particular, single subject showups are inherently suspect and generally not condoned, *Simmons v. United States,* 390 U.S. 377, 383, 88 S.Ct. 967, 970, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *State v. Sadler,* 95 Idaho 524, 529, 511 P.2d 806, 811 (1973); *see Manson v.*

*Brathwaite,* 432 U.S. at 109, 97 S.Ct. at 2250. Also, the danger of misidentification may increase where a witness is presented with several lineups or showups in which a single individual has a recurring presence. *Simmons v. United States, supra; e.g., Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). In the present case, the initial six-photo lineup elicited a somewhat tentative identification, at least on the part of Tracy Boyd. It was followed by the single subject showup and then a corporeal lineup of six persons including the defendant, which resulted in strong positive identification of Hoisington by both witnesses. In light of the use of the single photo showups, and the several identification procedures in which Hoisington had a recurring presence, we conclude that there is at least sufficient indicia of suggestiveness in the identification procedures to require review under the *Manson-Biggers* balancing test.[5] Thus, we turn to a review of the facts of the present case in light of the *Manson-Biggers* test.

1. The opportunity to view. The rape took place at approximately 6:00 a.m. on July 4, 1977. Testimony of defendant's witness, Kenneth Kenney, weather observer for the National Weather Service in Lewiston, indicated that although the sky at that time was 9/10ths overcast, the sun had risen at 5:01 a.m., and visibility at 5:57 a.m. was thirty surface miles. Tracy Boyd testified that her bed was about three feet from a window with white draperies and that there was "plenty of natural light" for her to see "very clearly." Boyd testified that she first saw the defendant standing at the foot of her bed and that they stared at each other for a few seconds. She stated that there was no obstruction to her view of the defendant. The defendant then moved

---

4. As indicated in *Neil v. Biggers, supra,* these factors are drawn from the varying circumstances of the United States Supreme Court's previous opinions in this area. 409 U.S. at 196–99, 93 S.Ct. at 380–82. Thus, it does not appear that the enumerated factors were necessarily intended to be exclusive, but rather were seen to be only a required core of factors to be considered in applying the "totality of circumstances" test.

5. We would agree with the trial court that the initial six photo lineup was not suggestive. In fact, with regard to one identifying trait, Hoisington's photo showed him with a short haircut, quite different from the description given by Boyd and Fuller, while the other five photos showed individuals with hair styles more closely approaching Boyd's and Fuller's descriptions.

around to the side of the bed and stopped. Boyd stated that she watched his face as he moved, and that when he stopped he was only two or three feet away. Boyd screamed once, and the defendant told her to "shut up." Boyd screamed again, and the defendant said, "Shut up or I'll kill you." Boyd then told the defendant that she was not trying to scream, but could not help it. The defendant then knelt down by the bed and told Boyd not to look at him. Boyd testified that up until that time she had been looking at the defendant's face and that the view was unobstructed. Thereafter, the defendant made Boyd roll over on the stomach, and he put a pillow over her head. Then they went to Sharon Fuller's room. After that point Boyd did not see the defendant's face. However, Tracy Boyd's testimony makes it clear that although she saw the defendant for perhaps a half a minute, she had a very good look at the defendant from close proximity and under good lighting conditions.

Sharon Fuller also testified that it was "fairly light" in her room at the time of the attack. She further testified that when Hoisington and Boyd entered her room she had an unobstructed view of Hoisington's face. He said, "Don't look at me," but Fuller kept looking. Hoisington repeated the command in a louder voice, but Fuller kept looking. She stated that she got "[a] clear look. I saw his whole face." Then Hoisington told Fuller to put a pillow over her head, and she complied. At one point thereafter, Fuller looked out from under the pillow. She was within arm's reach of Hoisington and stated that when she looked out their faces met. Then Hoisington again said, "Don't look at me," and Fuller put the pillow back up. While Sharon Fuller seems to have had a briefer period of time to observe the defendant than did Tracy Boyd, still Fuller had opportunity to obtain two good looks at defendant at close range with adequate lighting.

2. The degree of attention. Boyd was "no casual observer, but rather the victim of one of the most personally humiliating of all crimes." *Neil v. Biggers,* 409 U.S. at 200, 93 S.Ct. at 382. Her testimony indicates that during the time of her observa-tions, she focused almost exclusively on the assailant's face. Likewise, Sharon Fuller testified that she looked at the assailant's face the second time in particular "because I wanted to remember it." Clearly both women were attentive observers during the time which they had to view the assailant.

3. The accuracy of the description. On July 4, 1977, the date of the rape, Boyd and Fuller provided the police with a general description of the assailant matching the appearance of the appellant. On that same date, Boyd and Fuller met with Officer Stucker of the Lewiston police department. The two women constructed a composite picture of the assailant from a kit. With reference to the composite, the district court later found, not unreasonably, that "there is a striking resemblance to the defendant in that picture."

4. The witness's level of certainty. Sharon Fuller on December 8, 1977, and Tracy Boyd on December 9, 1977, were separately shown the six-photo lineup containing Hoisington's picture. Both positively identified Hoisington as the rapist; however, Tracy Boyd's identification was slightly tentative in that she stated that she was "relatively certain," that Hoisington's photo was that of the rapist. The slight hesitance evidenced by the response may well be explained by the fact that the photo of Hoisington showed him with short hair, while the rapist had significantly longer and wavy hair. The existence of the $8 \times 10$ photos of Hoisington, in which he was shown with almost shoulder length curly hair was not discovered until December 10, during a search of appellant's house following his arrest. Officer Spears testified as follows:

"When we were in Mr. Hoisington's house serving a search warrant I observed this same picture in a frame on an end table. And I observed that the hair was much more close to that as given by the victims than what Mr. Hoisington was presently wearing. The present style that he had. This was the main reason that I took the—or went to the Tribune and obtained larger pictures because it did display a different style of hair."

Viewing the lineup photo of Hoisington and the 8 × 10 photo, it is clear that the different hair style made a significant difference in his appearance. Immediately upon being shown the 8 × 10's of Hoisington, Tracy Boyd turned red, pointed to it, and stated, "That's him." Under the circumstances, notwithstanding the suggestive nature of the single subject showup, Tracy Boyd's level of certainty was very high. It is evident that Sharon Fuller's level of certainty was high even from the time of the first photo lineup.[6]

5. The length of time between the crime and the identification. Although Boyd and Fuller provided a description and completed the composite of the assailant on July 4, 1977, the day of the rape, they did not identify Hoisington as the rapist until five months later. This situation is similar to that which occurred in *Neil v. Biggers, supra,* where there was a seven month gap between the crime and the identification. In *Biggers* the following was stated:

"There was, to be sure, a lapse of seven months between the rape and the confrontation. This would be a seriously negative factor in most cases. Here, however, the testimony is undisputed that the victim made no previous identification [of another individual] at any of the showups, lineups, or photographic showings. Her record for reliability was thus a good one, and she had previously resisted whatever suggestiveness inures in a showup." 409 U.S. at 200, 93 S.Ct. at 382.

Likewise, in the present case, the record shows that the women had been previously presented with both single photo showups and lineups during the five month interval, and had not made any identification prior to identifying the defendant. A five month interval is also certainly less negative than a seven month interval. Consequently, we believe the reasoning of the *Biggers* court on this subject is equally applicable to the case at bar.

In light of the totality of the circumstances presented in this case, the aspects of reliability with regard to Boyd's and Fuller's identification of the defendant far outweigh any suggestiveness that may have

**6.** This case is distinguishable from *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). In *Foster,* a witness was presented a lineup containing the defendant. The defendant wore a leather jacket similar to one worn by the robber. The witness was unable to say more than he "thought" the defendant was the man, but was not sure. Then the defendant was presented before the witness in a one person showup. Still the witness was uncertain. Finally, the defendant was presented before the witness a third time, in a new lineup. That time the witness was "convinced" the defendant was the man. In condemning those identification procedures, the Supreme Court of the United States stated:

"The suggestive elements in this identification procedure made it all but inevitable that David would identify petitioner whether or not he was in fact 'the man.' In effect, the police repeatedly said to the witness, '*this* is the man.'" 394 U.S. at 443, 89 S.Ct. at 1129. While the lineup-showup-lineup sequence of events in the present case parallel the procedures in *Foster,* there are important differences. First, there is no evidence in *Foster* that there was a significant difference between the appearance of the robber at the time of the crime and the appearance of the defendant in the lineups and showup. Here, the rapist had longer curly or wavy hair. Hoisington in fact had such hair, but had cut it not long before the photograph for the six photo lineup was taken. It is clear that the short haircut made a significant difference in Hoisington's appearance. Second, in *Foster* the showup and second lineup were not supported by any legitimate need for additional viewings; rather the *only* purpose served appears to have been repetitive exposure. In the present case, however, the 8 × 10 showup was held only because of the discovery of new identification evidence with regard to Hoisington's personal appearance, which established that he resembled the rapist more closely than had previously been known. Also, the corporeal lineup in the present case was important because the witnesses had not, up to that time, ever personally seen Hoisington. Certainly, physical identification and photographic identification are two different things. In *Foster,* all viewings were corporeal. Finally, although Tracy Boyd's initial identification was a bit tentative, it was certainly much stronger than that of the witness in *Foster* following the first two viewings. Thus, there was clearly less room for undue influence through repetitive identification procedures in the present case than there was in *Foster.* Consequently, we conclude that the procedures in the present case did not violate the dictates of *Foster.*

been present in the identification procedures employed by the police. Consequently, we find that the admission of the identification testimony was not erroneous.

## C. Expert testimony.

 Finally, the appellant argues that the trial court erred in refusing to admit the expert testimony of a psychiatrist, Dr. Loftus, concerning the reliability of eye witness identification. It is a well known rule that "[t]he admissibility of expert testimony is discretionary with the trial court . . ., and [that] absent an abuse of discretion, a decision will not be disturbed on appeal." *State v. Griffiths,* 101 Idaho 163, 165, 610 P.2d 522, 524 (1980) (citations omitted).

Such testimony on the reliability of witness identification has been repeatedly proffered by defendants and rejected by the courts. *E.g., United States v. Fosher,* 590 F.2d 381 (1st Cir.1979); *United States v. Brown,* 540 F.2d 1048 (10th Cir.1976); *United States v. Amaral,* 488 F.2d 1148 (9th Cir.1973); *People v. Lawson,* 37 Colo.App. 442, 551 P.2d 206 (1976); *Dyas v. United States,* 376 A.2d 827 (D.C.App.1977); *State v. Brown,* 17 Wash.App. 587, 564 P.2d 342 (1977) (rejecting testimony by the same Dr. Loftus). We agree with the following conclusion reached by the Supreme Court of Rhode Island:

> "We are persuaded that the subject matter of the proffered testimony in this case, the trustworthiness in general of eye witness observations, was not beyond the ken of the jurors, and therefore the trial justice did not abuse his discretion in excluding this evidence. Through cross examination, defense counsel was able to probe into the witness's capacity and opportunity for observation, her attention, interest and distraction. The jury was perfectly capable of assessing the witness's credibility by weighing the incon-

sistencies and deficiencies elicited in cross examination." *State v. Porraro,* 404 A.2d 465, 471 (R.I.1979).

We therefore find no error in the court's refusal to admit the testimony of Dr. Loftus.

The defendant's conviction in the Boyd case is affirmed.

DONALDSON, C.J., SHEPARD, J., and McFADDEN, J. (Ret.), concur.

BISTLINE, J., concurring and dissenting.

Although I concur in that portion of the Court's opinion which affirms the appellant's conviction in the O'Connor case, I do not join in the remainder of the opinion. The appellant's conviction in the Boyd case should be reversed, primarily on the ground that it was prejudicial error for the trial court to allow the court reporter to testify on rebuttal as to the incriminating statement which she allegedly heard the appellant make to his counsel during the preliminary hearing.

As in the recent case of *State v. Olsen,* 103 Idaho 278, 286–287, 647 P.2d 734, 742–43 (1982) (Bistline, J., dissenting), the "rebuttal" testimony offered in this case by the court reporter can only be properly characterized as an admission by the appellant. As such, the offered testimony was clearly a material part of the State's case which, if admissible and if accurate, would properly have been introduced to establish the appellant's guilt.[1] The views which I expressed in *Olsen* were sound and, seeing no reason to discard them to fit this case, I would hold (1) that the court reporter's testimony should not have been allowed upon rebuttal,[2] and (2) it should have been excluded on the grounds that it was obtained in violation of the appellant's right to effective assistance of counsel. Despite what the majority opinion might bring one to believe,

---

1. The court reporter's complete testimony is set forth in the Appendix.

2. Because this witness was not a proper rebuttal witness, the state was required to disclose her name to the appellant pursuant to his request. I.C.R. 16(b)(6). Although the state ar-

gues that it "offered its files to the defendant," this is not sufficient. I.C.R. 16(b)(6) requires the prosecuting attorney to provide a defendant with "a written list of the names and addresses of all persons . . . who may be called by the state as witnesses at the trial."

this is not at all a case in which the appellant chose to make a communication to his attorney in the presence of third parties.

Most practicing attorneys of more than limited experience would, I feel certain, entertain the view that a court reporter is the right arm of the trial judge himself, and usually the darling of the jury as well. The court reporter, for instance, will be relied upon to read back stenographic or stenotype notes where the court is in need of knowing what has been testified to in order to make a ruling. And, although there may at trial be argumentative exchanges between counsel, and sometimes even with the judge, the court reporter is no part of such goings-on. In short, the court reporter is in the court room to serve the important function of recording all that is said—and by that I mean *all that is said at the trial* —which has to do with the trial, to wit, the questions of counsel, answers of the witnesses, objections of counsel, arguments thereon, and rulings by the court.

A person, other than that she or he is a court reporter, does not get to sit where court reporters sit. Court reporters sit where they do so that they can hear questions of counsel, the answers of witnesses, and the remarks and rulings of the court. Court reporters are thus placed in close proximity to the attorneys and their clients. They are so placed in the furtherance of the business of the court. They are not placed there with any thought in mind that they are or can be privy to conversations of attorney and client. In short, in such history as I have known of the customs, practices, and habits of court reporting—which is a lifetime in excess of 60 years, all of which but the early years being within recollection—court reporters hear nothing, see nothing, and do nothing other than that which is the obligation of their duties to hear, see, or do. A court reporter so positioned near counsel benches necessarily has to so understand; otherwise the judicial process will have to come to a standstill when an attorney would speak to his client, or the client would speak to his attorney. A court reporter will not be a surreptitious listening device for either party, either intentionally or inadvertently.

Compounding the instant situation, it would seem to me that if the court reporter, while attending to duty, did hear that which was testified to, and thought it pertinent to the trial, the remarks should have been stenographically taken down—but that did not happen, conclusively establishing the reporter's understanding that the alleged conversation later reported to the prosecutor was not any part of the trial. Then, too, if the reporter as a citizen felt duty-bound to inform others of the conversation, it would seem that if it was worth the hearing, then surely it was worth the writing. It is indeed that in such manner court records are made and relied upon, nothing being left to recollection.

The majority is willing to assume without deciding that the court reporter's testimony was inadmissible. From this, however, the jump is quickly made to a holding that "because there is, beyond a reasonable doubt, overwhelming and conclusive proof of this defendant's guilt, the admission of the court reporter's testimony was harmless error." This is made possible by resorting to what I fear in many courts has now become the trite cliche that "there is an abundance of other evidence upon which a conviction could be based." I cannot agree. Nor can I agree with the Court's conclusion that the testimony was harmless error.[3]

The "abundance of other evidence" upon which the Court relies, primarily consists of Boyd's and Fuller's identification of the appellant (or his photograph) as the assailant. In addition, the Court relies on the fact that

---

3. Constitutional "harmless error," created by the United States Supreme Court, is fast becoming the most destructive tool which prosecutors and appellate courts use to guard against awarding a new and error-free trial to a defendant who on appeal has established prejudicial error. Professor Steven Goldberg's article on Constitutional Harmless Error is an absolute must for defense counsel who would prevail on appeal but for its creation. Goldberg, *Harmless Error: Constitutional Sneak Thief*, 71 J.Crim.L. & Criminology 421, 427 (1980).

the appellant fit what was a rather general description of the assailant given by the two women shortly after the incident. To my mind this hardly constitutes an "abundance." This is especially true when one considers the great potential for misidentification in situations such as this and the fact that the identifications of the appellant in this case occurred under what can be best characterized as highly questionable circumstances. As the court noted in *United States v. Russell,* 532 F.2d 1063, 1066 (6th Cir.1976):

> "There is a great potential for misidentification when a witness identifies a stranger based solely upon a single brief observation, and this risk is increased when the observation was made at a time of stress or excitement. Since this danger is inherent in every identification of this kind, courts should be especially vigilant to make certain that there is no further distortion of the possibly incomplete or mistaken perception of a well-meaning witness by suggestive or other unfair investigatory techniques. *United States v. Wade,* 388 U.S. 218, 228–29, 87 S.Ct. 1926, 1932–33, 18 L.Ed.2d 1149, 1158 (1967); see F. Frankfurter, *The Case of Sacco and Vanzetti* 30 (1927), W. Ringel, *Identification and Police Lineups* 10 (1968), P. Wall, *Eye-Witness Identification in Criminal Cases* (1965), Eisenberg & Fenstel, 'Pre-Trial Identification; An Attempt to Articulate Constitutional Criteria,' 58 Marquette L.Rev. 659 (1975), Grano, 'Kirby, Biggers, and Ash: Do Any Constitutional Safeguards Remain Against the Danger of Convicting the Innocent?' 72 Mich.L.Rev. 717 (1974)."

The Court in this case concludes that although the out-of-court identification procedures used by the police were suggestive "the aspects of reliability with regard to Boyd's and Fuller's identification of the defendant far outweigh any suggestiveness that may have been present . . . ." I cannot agree. While the Court's analysis of the issue may appear to be sound, my review of the record reveals that this result is achieved by the convenient omission of several important facts. Nowhere does the Court mention that detective Spears testified he believed that at the time he showed the photographic lineup to Boyd and Fuller, he told them "that one of the photos was a suspect." Nor does the Court mention that with regard to the show-up of the two eight by ten glossies of the appellant, detective Spears testified: "I advised [Boyd and Fuller] that I had a picture of the person that they had identified on the picture lineup. Explaining to them that the picture displayed the individual with longer hair." Spears also testified that he had stated at that time that the man in the photograph "was a suspect." The Court also neglects to consider that Boyd and Fuller were shown the glossies of the appellant shortly after a story had been published in the local newspaper that a rapist had been arrested in the O'Connor case. In fact, Tracy Boyd admitted that at the time she was shown the glossies, she knew from reading the newspaper that an arrest had been made in a local rape case. More suggestive circumstances, in my opinion, cannot be imagined. Thus, I cannot agree with the Court's conclusion that the aspects of reliability of the identification outweigh the suggestiveness of the procedures used. I would hold that the suggestive identification procedures denied the appellant due process and that the in-court identification of the appellant should have been excluded.

Because I believe that the out-of-court identifications were improper and necessarily had to result in tainted in-court identifications, I certainly cannot agree with a Court which succumbs to the State's argument that there is an abundance of evidence other than the court reporter's improper testimony which sustains the conviction. In *State v. LePage,* 102 Idaho 387, 396, 630 P.2d 674, 683 (1981), the Court stated that the question to be answered regarding the error in that case was: "Is the appellate court convinced beyond a reasonable doubt that the same result would have been reached had the evidence been

properly excluded?"[4] In this case I must answer, "no." The court reporter, as an official of the court, carried an aurora of authority, her testimony, without a doubt, as any practicing trial attorney will agree, in the eyes of a jury would be most persuasive and here that evidence was an admission by the appellant that he had in fact committed the crime. The very fact that the prosecutor held back any mention of that testimonial evidence until he was in the final seconds of his closing argument clearly demonstrates its importance in the case. It is impossible for me to see how anyone, but especially an appellate court, can so easily declare itself convinced beyond a reasonable doubt that the same result would have been reached had the reporter's testimony be excluded. By no stretch of the most elastic of harmless error doctrines can it be said that such evidence was harmless. The appellant's conviction in the Boyd case should be reversed.

## APPENDIX

JEAN GERSTENBERGER called on behalf of the State, first duly sworn, testified as follows:

## REBUTTAL EXAMINATION
BY MR. PETRIE:

Q For the record will you state your full name please.

A Jean Gerstenberger.

Q And what do you do for a living?

A I am a court reporter.

Q How long have you been a court reporter?

A Four years.

Q And where did you receive your training?

A At a school called the Academy of Stenographic Arts in San Francisco, California.

Q And how long does that training take?

A Two years.

Q And did you successfully complete that training?

A I did not graduate from the school, no sir.

Q Okay. How long have you been a court reporter in this area?

A Two and a half years.

Q And what towns do you report in?

A I cover the Second Judicial District which would be anywhere from Grangeville up to Moscow.

Q What special training, if any, do you receive to become a court reporter?

A I don't know how to answer that. You learn to operate the machine and to take everything down verbatim and to listen carefully.

Q Listen carefully to whom?

A To whoever is speaking.

Q I see. Did you have an occasion to take a preliminary hearing on the 27th of December, 1977?

4. The harmless error question to be answered in *LePage* was fashioned for that particular case, and was not a paraphrasing of the rule as stated in *State v. Garcia*, 100 Idaho 108, 111, 594 P.2d 146, 149 (1979), and also applied in *State v. Stewart*, 100 Idaho 185, 187, 595 P.2d 719, 721 (1979). Both *Garcia* and *Stewart* relied upon similar language in *State v. Smoot*, 99 Idaho 855, 590 P.2d 1001 (1978). The *LePage* harmless error rule was recently erroneously misapplied in *State v. LeMere*, 103 Idaho 839, 655 P.2d 46 (1982), where four members of the Court regardless of being advised that the State was relying on a different and proper standard, insisted on using it, finding itself "convinced beyond a reasonable doubt that the jury would still have arrived at the same verdict," even had the prosecutor's statement been excluded. It would seem to me that such a rule, which is clearly a usurpation of the jury function, should never be applied unless the court which applies it is a *unanimous court.* How can a court, as distinguished from a mere majority of a court, be convinced of anything beyond a reasonable doubt when constituently it is only 80 percent so convinced or 60 percent so convinced? So viewed it is a rather monstrously dangerous doctrine. In deciding criminal guilt, on a cold record, and excluding evidence erroneously allowed or inflammatory prosecutorial comment, a court of five members should be as unanimous as is required of a jury. The *Garcia, Smoot, Stewart* and *LePage* courts were unanimous.

A Yes sir, I did.

Q And what preliminary hearing were you taking at that time?

A It was State of Idaho versus Monte Hoisington.

Q And did that involve the Traci Boyd rape?

A Yes sir.

Q Do you recall when Traci Boyd was testifying at that preliminary hearing?

A Yes sir.

Q And were you the reporter at that preliminary hearing?

A Yes sir.

Q Where was that taken?

A In courtroom three in the Nez Perce County Courthouse.

Q This same building?

A Yes sir.

Q Do you recall of anything unusual being said during that preliminary hearing while Traci Boyd was testifying?

A Yes sir.

Q And do you recall when this unusual item was said—do you recall what the topic was when Traci Boyd was testifying?

A Yes sir.

Q And what topic was she testifying to at that time?

MR. AHERIN: If the Court please, I am going to object. I don't know where counsel is headed. If he is having her testify as to what was recorded, that is part of her official duties as the court reporter. If he is trying to impeach some testimony, there is a recorded statement.

MR. PETRIE: I am not, your Honor. I merely want to get the topic of the conversation that the witness was testifying to.

THE COURT: Yes, the objection is overruled.

MR. PETRIE: Thank you.

Q Do you recall the topic of conversation—or the topic of testimony at that time?

A Yes sir.

Q And what did that entail—not the precise testimony, but what was the topic about?

A The topic was about a pillow.

Q And what about the pillow?

A I don't understand if you want me to say what she was saying or what.

Q Well, basically what was she testifying to concerning the pillow?

A She was testifying to the pillow behind her head.

Q Okay. And at that time did the defendant—did you hear the defendant say anything?

A Yes sir.

Q What did you hear him say?

MR. AHERIN: If the Court please, I am going to object to that. Is this to something she recorded or an unrecorded statement?

THE COURT: This is something—the question was directed as to something she heard. I don't know whether it was recorded or whether it wasn't, that she heard the defendant—the question, as I understand it, is something she heard the defendant say while Miss Boyd was testifying regarding the pillow.

MR. AHERIN: If the Court please, I am going to move to—object to the testimony on the basis that it is improper impeachment if that is an attempt to impeach the testimony of someone that has already testified. I think it is an improper form of rebuttal.

THE COURT: The objection is overruled.

MR. PETRIE: Thank you, your Honor.

Q To clarify the record, was the defendant testifying at that time?

A No sir.

Q Where was the defendant at that time?

A At counsel table.

Q And about how far away from you was he?

A Five feet. I am not too good at distance.

Q Okay. And at that time when Traci Boyd was testifying to the position of the pillow what did the defendant say, if you recall?

A I do not recall his exact words.

Q Do you recall the effect of those words?

A Yes sir.

Q What are they?

A That he had not placed the pillow that way, or that was not how the pillow was placed.

Q And to whom did he say that to?

A Mr. Aherin.

MR. PETRIE: No further questions.

CROSS–REBUTTAL EXAMINATION
BY MR. AHERIN:

Q How close was I to Mr. Hoisington?

A You were seated next to him.

Q Closer than you?

A Yes sir.

Q And you are absolutely sure that that is what he said?

A Not to his exact words but that was the idea, yes sir.

Q How do you know that was the idea if you don't know the exact words?

A Because I remember when he made the statement that it indicated to me that he had been there because he knew what he was talking about.

Q Could you have been mistaken since you didn't hear it exactly?

MR. PETRIE: Objection, your Honor. That is an improper question.

THE COURT: Overruled.

MR. PETRIE: Thank you.

A I heard it exactly but I do not remember what the words are now.

Q Do you think I would have heard that statement if it was made?

A Yes sir, you heard it because you asked him to be quiet.

Q At the time—what was the date of this statement?

A It was during the preliminary hearing which was on December 27th, 1977.

Q Was that the only thing you ever heard the defendant say during that time?

A That is the only thing I understood.

Q You don't remember what was said right before that?

A As I recall, Mr. Aherin, nothing.

Q You are saying that he never said anything to me up to that time?

A No sir, I am just saying that right before that he was sitting there saying nothing.

Q Was there a witness testifying at this time?

A Traci Boyd.

Q Do you remember what Traci Boyd—do you remember what page that was on the transcript?

A No sir, I haven't looked at the transcript since I—I believe it is in the first part but I am not sure.

THE COURT: Do you want a recess, Mr. Aherin?

MR. AHERIN: Yes.

THE COURT: All right, we'll take a short recess.

(RECESS TAKEN AT 10:50 O'CLOCK A.M. RECONVENED AT 11:15 O'CLOCK A.M.)

THE COURT: Mr. Aherin.

MR. AHERIN: If the Court please, at this time I would move for a mistrial on the grounds that the impeachment attempts by the prosecutor was improperly done in that the defendant was never confronted with this statement, if they are trying to make an inconsistent statement, and it has resulted in highly prejudicial matters being before the jury. It also puts me in the position of an ethical problem and for those reasons I would move for mistrial.

THE COURT: The motion is denied.

Q You indicated that the witness was testifying about a pillow?

A Yes sir.

Q Do you recall at that time the materials that were on counsel table at that particular time?

A Your table?

Q Correct.

A The only thing I recall would be your file, nothing else.

Q Do you recall a stack of papers, police reports?

A I have no idea. I do not recall them.

Q You have no idea then?

A I remember your file being there but I do not know what else.

Q Now you answered the question in the alternative. Your answer was at least an or answer. At the time do you recall if I had a note pad or anything and was writing?

A I believe so.

Q Do you recall if Mr. Hoisington had any papers before him?

A I do not recall.

Q Do you have any knowledge whether Mr. Hoisington had read the statements and the material that was in my file?

A I have no knowledge.

Q Then you don't know if he was making reference to another statement, do you?

A No sir.

MR. AHERIN: I have no further questions.

REDIRECT REBUTTAL EXAMINATION

BY MR. PETRIE:

Q Mrs. Gerstenberger, you were subpoenaed to testify here today, weren't you?

A Yes sir.

MR. PETRIE: No further questions.

THE COURT: You may step down.

MR. PETRIE: The State calls Dennis Gamet.